Lumbermens Mutual Casualty Company *vs.*
Belleville Industries, Inc.

Suffolk. March 7, 1990. - June 14, 1990.

Present: Liacos, C.J., Wilkins, Abrams, Lynch, & Greaney, JJ.

*Insurance*, Comprehensive liability insurance, Pollution exclusion clause, Defense of proceedings against insured, Coverage, Construction of policy. *Contract*, Insurance, Construction of contract. *Supreme Judicial Court*, Certification of questions of law. *Words*, "Sudden," "Accidental."

In construing, as matter of Massachusetts law, an exception to the pollution exclusion clause contained in a policy of comprehensive general liability insurance, providing, "[T]his exclusion shall not apply if the discharge . . . [of pollutants] is sudden and accidental," this court held that the word "sudden," in conjunction with "accidental," was unambiguous and had a temporal element, that is, only an abrupt discharge or release of pollutants would fall within the exception and thus be covered by the policy. [677-682]

Where language in the pollution exclusion clause contained in a policy of comprehensive general liability insurance was unambiguous, this court had no occasion to consider either the drafting history of the clause or statements made by insurance company representatives concerning the intent of the drafters. [682-683]

In reply to a question of Massachusetts law certified to it by a Federal court, this court expressed the view that a declaratory judgment proceeding under G. L. c. 231A appears to be the only procedure clearly available in all circumstances for determining whether, in light of the allegations in a particular complaint, an insurer has a duty to defend an action against its insured. [683-686]

This court declined to answer a question of law certified to it by a Federal court where the record in the Federal case revealed substantial issues of fact and where the certification order did not contain the statement of facts required by S.J.C. Rule 1:03, § 3(2). [686-688]

CERTIFICATION of questions of law to the Supreme Judicial Court by the United States District Court for the District of Massachusetts.

*Timothy C. Russell* of the District of Columbia (*Michael S. Greco* with him) for the plaintiff.

*David A. McLaughlin* for the defendant.

*William M. Savino, Stephen J. Smirti, Jr., Gary D. Centola, & Laurence Levy* of New York, & *Cynthia J. Cohen*, for Fireman's Fund Insurance Company, joined in a brief.

The following submitted briefs for amici curiae:

*Wm. Gerald McElroy, Jr., Janet L. R. Menna & Karl S. Vasiloff* for Employers Insurance of Wausau.

*James L. Ackerman* for Aetna Casualty & Surety Co.

*Howard T. Weir* of the District of Columbia, *Brian T. Kenner, Martin C. Pentz, Maria Raia Hamilton, Richard W. Benka & Edward J. Stein* for AVX Corporation, & others.

*Thomas W. Brunner, James M. Johnstone & Lyn S. Entzeroth* of the District of Columbia, & *Peter G. Hermes & Molly H. Sherden* for Insurance Environmental Litigation Association & another.

WILKINS, J. A judge of the United States District Court for the District of Massachusetts has certified questions of law to us, pursuant to S.J.C. Rule 1:03, 382 Mass. 700 (1980), that arise out of a dispute between Lumbermens Mutual Casualty Company (Lumbermens) and its insured, Belleville Industries, Inc. (Belleville).[1] Belleville is one of the defendants in an action brought by the United States and the Commonwealth of Massachusetts in the United States District Court for the District of Massachusetts alleging that the defendants are liable for the polychlorinated biphenyl (PCB) pollution of New Bedford Harbor. In the mid-1970s, Belleville used PCBs in manufacturing electrical capacitators in a

---

[1] At the time the judge certified the questions to us, a similar dispute between Aerovox, Inc., and Fireman's Fund Insurance Company was also before him. That dispute, however, was settled before oral argument in this court.

plant it owned on the east bank of the Acushnet River, which flows into New Bedford Harbor.

The background for the certification of the questions of law appears in *In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution*, 725 F. Supp. 1264 (D. Mass. 1989), which we shall refer to hereafter as *Acushnet River*. The first set of questions concerns a dispute over the proper interpretation of an exception to the pollution exclusion clause in the comprehensive general liability policies that Lumbermens issued to Belleville. The second question deals with how an insurer might effectively terminate its duty to defend an action when the complaint alleges a claim that, on its face, falls within the coverage of the policy, but it appears from the known facts that the claim is entirely or almost entirely outside the policy coverage. The third question concerns which of the successive policies Lumbermens issued to Belleville provide coverage for damage caused by the occurrences. In addition, the judge has offered us an opportunity to comment on any other aspect of his discussion of Massachusetts law. *Acushnet River*, 725 F. Supp. at 1280-1281. We do not, however, see any additional matter on which we wish to comment.

1. In Belleville's comprehensive general liability insurance policy, Lumbermen's agreed, among other things and subject to certain exclusions and exceptions, to provide coverage for liability due to property damage caused by an occurrence. An "occurrence" is defined in the policy as "an accident . . . which results in . . . property damage neither expected nor intended from the standpoint of the insured." For the purposes of this case, the judge and the parties have assumed that the State and Federal governments, in their underlying claims, seek to recover for property damage caused by an occurrence.

Our focus has been directed to exclusion (f), the so-called pollution exclusion clause, which states that no insurance applies to property damage "arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or

other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental*" (emphasis supplied). In this case, Belleville argues that the exclusion does not apply to deny coverage because the releases of pollutants at issue in the underlying case were both "sudden and accidental" within the meaning of those words in the Lumbermens policy.

The certifying judge recognized that there is no unanimity of opinion, even within Massachusetts, concerning the proper interpretation of the "sudden and accidental" exception to the pollution exclusion clause. *Acushnet River*, 725 F. Supp. at 1279. He noted *Shapiro* v. *Public Serv. Mut. Ins. Co.*, 19 Mass. App. Ct. 648 (1985), in which the Appeals Court had concluded that the clause was ambiguous and, therefore, provided coverage for the consequences of a gradual discharge of a pollutant. *Acushnet River*, 725 F. Supp. at 1267 n.7, 1279. He recognized, on the other hand, that another judge of the United States District Court for the District of Massachusetts had not followed the holding in the *Shapiro* case and had questioned whether this court would do so. *Id.* at 1279, citing *C.L. Hauthaway & Sons Corp.* v. *American Motorists Ins. Co.*, 712 F. Supp. 265, 268-269 (D. Mass. 1989). Indeed, the certifying judge himself rejected the *Shapiro* holding and concluded that the words "sudden and accidental" were not ambiguous. *Acushnet River*, 725 F. Supp. at 1267-1268 & nn.7-8.[2] But see *Allstate Ins. Co.* v. *Quinn Constr. Co.*, 713 F. Supp. 35, 41 (D. Mass. 1989), accepting, in dicta, the *Shapiro* opinion as authoritative.

---

[2]For other cases in which a Federal judge has declined to follow a State intermediate appellate court's conclusion that the language is ambiguous and has instead expressed the view that the State's highest court would not follow the intermediate appellate court, see *FL Aerospace* v. *Aetna Casualty & Sur. Co.*, 897 F.2d 214, 219-220 (6th Cir. 1990); *State* v. *Amro Realty Corp.*, 697 F. Supp. 99, 109-110 (N.D.N.Y. 1988); *Borden, Inc.* v. *Affiliated FM Ins. Co.*, 682 F. Supp. 927, 929 (S.D. Ohio 1987), aff'd without op., 865 F.2d 1267 (6th Cir.), cert. denied, 110 S.Ct. 68 (1989).

Although the certifying judge announced his construction of the exception in the pollution exclusion clause, he certified to us three questions concerning that issue: "(a) Is the word 'sudden' as appearing in the pollution exclusion clauses at issue in this case unambiguous? (b) If the answer to question (a) above is yes, does that term have a temporal quality? (c) If the answer to question (b) above is yes, what considerations ought this Court employ in determining which events qualify as 'sudden'?" *Acushnet River*, 725 F. Supp. at 1279.

The sudden event to which the exception in the pollution exclusion clause applies concerns neither the cause of the release of a pollutant nor the damage caused by the release. It is the release of pollutants itself that must have occurred suddenly, if the exception is to apply so as to provide coverage. The exception thus focuses on the circumstances of the release. In deciding whether there was an occurrence, on the other hand, the focus of the inquiry is on the property damage, asking whether it was expected or intended from the insured's point of view. Courts that have failed to appreciate this distinction have led themselves to identify an ambiguity in the policy language that does not exist. See *American Motorists Ins. Co.* v. *General Host Corp.*, 667 F. Supp. 1423, 1427-1429 (D. Kan. 1987), discussing the mistreatment of the pollution exclusion clause by certain courts. Other courts have construed "sudden" in isolation without recognizing the significance of the companion word "accidental." See *Claussen* v. *Aetna Casualty & Sur. Co.*, 259 Ga. 333, 335 (1989). See also Note, The Pollution Exclusion Clause Through the Looking Glass, 74 Geo. L.J. 1237, 1240 (1986), criticizing judicial treatment of the pollution exclusion clause.[3] We, of

---

[3]"Paradoxically, the courts have almost uniformly ignored the insurers' intent and distorted the phrase 'sudden and accidental' beyond recognition. With few exceptions, the courts have extended the coverage of policies containing the pollution exclusion 'to mean just what they choose it to mean.'" The Pollution Exclusion Clause Through the Looking Glass, 74 Geo. L.J. 1237, 1240 (1986). The note correctly recognized three more recent opinions that denied coverage in particular circumstances as a possible "beginning of a trend of accurate judicial construction of the pollution exclusion." *Id.* at 1264-1268.

course, reject any temptation to let our own ideas of public policy concerning the desirability of insurance coverage for environmental damage guide our legal conclusions.

We dealt with the words "sudden and accidental" in an insurance policy in *New England Gas & Elec. Ass'n* v. *Ocean Accident & Guar. Corp.*, 330 Mass. 640 (1953). There, the question was whether the damage to property, a crack in the spindle of a turbine, was a sudden and accidental break. *Id.* at 650. The court did not need to define the word "sudden" with specificity because the cracking of the spindle was neither gradual (hence was rapid or quick) nor reasonably expected or foreseen. *Id.* at 654. In short, that opinion left unanswered the question whether "sudden," in conjunction with the word "accidental," means only unexpected and unforeseen (as Belleview argues) or whether it also has a temporal quality (as Lumbermens argues).

For the word "sudden" to have any significant purpose, and not to be surplusage when used generally in conjunction with the word "accidental," it must have a temporal aspect to its meaning, and not just the sense of something unexpected. We hold, therefore, that when used in describing a release of pollutants, "sudden" in conjunction with "accidental" has a temporal element. The issue is whether the release was sudden. The alternative is that it was gradual. If the release was abrupt and also accidental, there is coverage for an occurrence arising out of the discharge of pollutants.

We answer the first two portions of the first question as follows: (a) the word "sudden" in the context of the pollution exclusion clause is unambiguous and (b) it has a temporal quality. This is the conclusion of the better reasoned, and particularly the more recent, judicial interpretations of the pollution exclusion clause that appears in the standard comprehensive general liability policy.[4] There are many opinions

---

[4]See, e.g., *United States Fidelity & Guar. Co.* v. *Star Fire Coals, Inc.*, 856 F.2d 31, 34 (6th Cir. 1988) ("We do not believe that it is possible to define 'sudden' without reference to a temporal element that joins together conceptually the immediate and the unexpected."); *Fireman's Fund Ins. Cos.* v. *Ex-Cell-O Corp.*, 702 F. Supp. 1317, 1326 (E.D. Mich. 1988)

reaching a contrary conclusion, the reasoning of which is criticized in many of the opinions just cited.[5] If the word "sudden" is to have any meaning or value in the exception to the pollution exclusion clause, only an abrupt discharge or release of pollutants falls within the exception.

The facts concerning the discharge of pollutants by Belleville have not been certified to us. Dealing with the certified questions in the abstract, we have said all that we can concerning the considerations that the judge should "employ in determining which events qualify as 'sudden.'" Surely, the abruptness of the commencement of the release or discharge of the pollutant is the crucial element.[6] Our certification rule calls for the presentation of the facts on which the certified question of law is based. See S.J.C. Rule 1:03, § 3 (2). We do not know enough about what the pollution was, and when

---

("Increasingly, the courts have rejected arguments similar to that being made here . . . that the phrase 'sudden and accidental' is ambiguous and are holding that 'sudden' includes a temporal aspect."); *State v. Amro Realty Corp.*, 697 F. Supp. 99, 110 (N.D.N.Y. 1988); *Borden, Inc. v. Affiliated FM Ins. Co.*, 682 F. Supp. 927, 930 (S.D. Ohio 1987); *American Motorists Ins. Co. v. General Host Corp.*, 667 F. Supp. 1423, 1428 (D. Kan. 1987); *International Minerals & Chemical Corp. v. Liberty Mut. Ins. Co.*, 168 Ill. App. 3d 361, 378 (1988); *Technicon Elecs. Corp. v. American Home Assurance Co.*, 141 A.D.2d 124, 131 (N.Y. 1988) ("A review of the most recent cases reveals that there is an emerging nationwide judicial consensus that the 'pollution exclusion' clause is unambiguous"), aff'd on other grounds, 74 N.Y.2d 66 (1989); *Waste Management of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 699-700 (1986); *Lower Paxon Township v. United States Fidelity & Guar. Co.*, 383 Pa. Super. 558, 576-578 (1989); *Just v. Land Reclamation, Ltd.*, 151 Wis. 2d 593, 601-602 (Ct. App. 1989).

[5]For examples of opinions that conclude that the pollution exclusion clause should be construed in favor of the insured to mean "unexpected and unintended," see *Claussen v. Aetna Casualty & Sur. Co.*, 259 Ga. 333, 338 (1989) (four to three decision); *Summit Assocs. v. Liberty Mut. Fire Ins. Co.*, 229 N.J. Super. 56, 63 (1988); *Kipin Indus., Inc. v. American Universal Ins. Co.*, 41 Ohio App. 3d 228, 231-232 (1987); *United Pac. Ins. Co. v. Van's Westlake Union, Inc.*, 34 Wash. App. 708, 714 (1983).

[6]We decline to speculate on the proper construction of the exception, if a release or discharge, initially both accidental and sudden, continues for an extended period. As the discharge or release continues, at some point, presumably, it would likely cease to be accidental or sudden (even in the sense of unexpected).

and how the release or discharge started, to say anything further.

We acknowledge that, in answering the first set of questions certified to us, we are rejecting the contrary holding in *Shapiro* v. *Public Serv. Mut. Ins. Co.*, 19 Mass. App. Ct. 648, 651-652 (1985). That opinion found guidance in our opinion in *New England Gas & Elec. Ass'n* v. *Ocean Accident & Guar. Corp.*, 330 Mass. 640 (1953), that we do not similarly find. The *Shapiro* opinion did not analyze the policy language but concluded that the policy was not free from ambiguity. We have analyzed the policy language and conclude that there is no construction of the word "sudden" that is a reasonable alternative to that which we have given it in the context of the pollution exclusion clause.

Because the word "sudden" in the pollution exclusion clause is not ambiguous, we have no need to consider the drafting history of that clause or any statements made by insurance company representatives concerning the intention of its drafters. There is no evidence in the record that Belleville relied on or was even aware of any of this background information when it purchased coverage from Lumbermens. The use of such information to resolve an ambiguity in Belleville's insurance policies would have nothing to do with contract negotiations, and thus its use would be different from the use of parol evidence to aid in resolving an ambiguity in a contract. Attempts to use the drafting history and official comments about the purpose of a provision in an insurance policy seem somewhat analogous to attempts to use legislative history in construing an ambiguous statute.

This court has not indicated the extent to which it is appropriate to use the drafting history of a provision in a standard form of insurance policy to resolve a dispute over the meaning of policy language. A formally published, explanatory report of an industry-wide committee that drafted particular policy language would appear likely to be a reliable source for resolving a policy ambiguity. Language changes from one standard policy form to the next would perhaps be instructive. See *Ratner* v. *Canadian Universal Ins. Co.*, 359

Mass. 375, 380 (1971). We have not considered, however, whether statements made after the adoption of standard language may properly be considered or whether the views of one insurance executive may properly be used to guide the interpretation of a standard form of policy used by many companies. Additionally, we have not decided whether the drafting history and other possibly instructive material must be included in the record on appeal and thus have been presented in a manner that would permit countervailing or explanatory material to be submitted in response. See *Eagle-Picher Indus., Inc.* v. *Liberty Mut. Ins. Co.*, 682 F.2d 12, 22 n.8 (1st Cir. 1982), cert. denied, 460 U.S. 1028 (1983); *Lower Paxon Township* v. *United States Fidelity & Guar. Co.*, 383 Pa. Super. 558, 578 n.5 (1989). We mention this subject only because it appears that the issue will arise in subsequent litigation concerning the interpretation of standard form insurance policies.

2. The second certified question asks whether, under the common law of the Commonwealth, there is any procedure by which an insurer, with a duty to defend but with apparently only a negligible duty to indemnify, can terminate its duty to defend short of conclusively establishing the extent of the underlying claim in circumstances binding on the underlying claimant. The judge points to the opinion authored by Justice Kaplan in *Sterilite Corp.* v. *Continental Casualty Co.*, 17 Mass. App. Ct. 316, 323-324 (1983).[7] The full statement of the judge's reasons for asking the question appears

---

[7] Justice Kaplan wrote: "When, as in the present case, the allegations of the third-party complaint find apparent lodgment in the effective coverage of the policy, the insurer is obligated to defend. But it can, by certain steps, get clear of the duty from and after the time when it demonstrates with conclusive effect on the third party that as matter of fact — as distinguished from the appearances of the complaint and policy — the third party cannot establish a claim within the insurance. . . . What is not permitted is that an insurer shall escape its duty to defend the insured against a liability arising on the face of the complaint and policy, by dint of its own assertion that there is no coverage in fact: the insurer then stands in breach of its duty even if the third party fails in the end to support any such claim of liability by adequate proof." *Id.*

in the margin.[8] In concluding that the duty to indemnify was negligible, the judge assumed that the word "sudden" in the pollution exclusion clause had the temporal meaning that he had given it in discussing the first question certified to us.

Lumbermens makes no attempt to describe to us a common law procedure under which its duty to defend could be terminated conclusively without the entry of an order binding on the governmental claimants in this case. Lumbermens argues that, under Fed. R. Civ. P. 19, the underlying claimants are not necessary parties to a declaratory judgment action

[8]"*2. De Minimis Liability to Indemnify Pursuant to the Sterilite Decision*

"The decision of the Massachusetts Appeals Court in *Sterilite Corp. v. Continental Casualty Co.*, 17 Mass. App. Ct. 316, . . . clearly sets forth the procedure which an insurer with a duty to defend must follow to bring that duty to an end. This Court reads *Sterilite* as directly declaring the law of the Commonwealth and raises no question concerning it. Nevertheless, its application to the particular circumstances of this case warrants certification. This is so because, while this Court has ruled that the insurers in these related cases have an undoubted duty to defend, their ultimate duty to indemnify their insureds appears limited to only a small fraction of the damages which may ultimately be recoverable in this case. In aid of the record in addressing the question to be posed, this Court takes judicial notice, Fed.R.Evid. 201, that each of the insurers herein has incurred more than one million dollars in legal costs in providing a defense of its client in the underlying actions. Even so, were it not for the *Sterilite* requirement, there appears virtually no evidence that any significant contribution to the pollution at issue in the underlying case flowed from incidents which were 'sudden and accidental.' That is, if an insured is liable for PCB pollution of the Acushnet River and New Bedford Harbor as alleged by the sovereigns herein, it appears from the entire record assembled by this Court that the proportion of that pollution which may properly be characterized as 'sudden and accidental' is slight compared to the whole, and perhaps infinitesimal. Thus, it is only this small portion of the potential damages as to which the insurers have a duty to indemnify. Nevertheless, it appears clear under *Sterilite* that the insurers have a continuing duty to defend and this Court has so held. However, in the absence of a controlling decision from the Supreme Judicial Court, this Court deems it appropriate to inquire whether, pursuant to the common law of the Commonwealth, there is any procedure whereby an insurer with an undoubted duty to defend but with a negligible duty to indemnify can bring the continuing duty to defend to an end short of conclusively establishing as against the plaintiff in the underlying action the extent of the claim that is covered by the insurance." *Acushnet River*, 725 F. Supp. at 1279-1280.

brought against an insured to determine insurance coverage rights. Further, Lumbermens argues that, because the governmental claimants opposed efforts to place them in a procedural posture in which they could be conclusively bound, they should either be deemed not to be necessary parties or to have waived any requirement that they be conclusively bound by any declaration of rights. Finally, citing *Burlington N. R.R.* v. *Woods*, 480 U.S. 1, 5 (1987), and *Hanna* v. *Plumer*, 380 U.S. 460, 471 (1965), Lumbermens argues that principles governing the entry of summary judgment under Fed. R. Civ. P. 56 override the asserted additional prerequisite of the *Sterilite Corp.* opinion that the declaration must have a binding effect on underlying claimants.

Each of these arguments concerns an issue that Lumbermens could have raised, and indeed may have raised, with the Federal judge. None of them concerns a question of State law. Our rule authorizing certified questions from other courts relates solely to questions of Massachusetts law. We do not offer our gratuitous services to opine on questions of Federal law. In any event, the judge did not ask us about these issues of Federal law. He has asked us if there is a common law procedure for conclusively cutting short an insurer's duty to defend in which the underlying plaintiff would not be bound by the determination. In circumstances in which the party to be benefited by a particular answer does not argue the point to us, we feel no heavy burden to answer a certified question in detail. We abstain from speculating on why a declaratory judgment proceeding involving all concerned entities was not maintained in the Federal court.

A declaratory judgment in an action provides an appropriate means of deciding a dispute concerning the meaning of language in an insurance policy. See *Boston Symphony Orchestra, Inc.* v. *Commercial Union Ins. Co.*, 406 Mass, 7, 15-16 (1989). The problem becomes more complicated when the dispute between insurer and insured involves, not the construction of policy terms, but rather whether, in light of the allegations in a particular complaint, the insurer has a duty to defend. It is that issue that is discussed so thought-

fully in the *Sterilite Corp.* opinion. The need to have the underlying claimant bound by any judicial declaration concerning the insurer's duty to defend does not exist because the underlying claimant would be a necessary party to the action (a matter on which we express no opinion). Rather, that need exists because, until there is an unalterable determination as to the nature of the underlying claim, any declaration of rights concerning the insurer's duty to defend cannot be conclusive. Although our answer (that a declaratory judgment proceeding under G. L. c. 231A [1988 ed.] provides a "procedure" for definitively resolving a "duty to defend" dispute) does not identify a common law procedure (as to which the judge inquired), it appears to be the only procedure clearly available in all circumstances.

We do not discount the possibility of an action solely between an insurer and an insured concerning the insurer's duty to defend, where the complaint in the underlying action is so general as to allege a claim arguably falling within the coverage of the policy, but it is apparent from the event that gave rise to the underlying claim that the loss is not covered by the insurance policy. See, e.g., *Atlantic Mut. Fire Ins. Co. v. Cook*, 619 F.2d 553, 554-555 (5th Cir. 1980). Although a determination that the insurer had no duty to defend in those circumstances would not foreclose such a duty if the facts of the underlying claim changed, or if the complaint were amended, that determination would relieve the insurer of a current duty to defend based on then-current circumstances. See *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 168-169 (1983).

3. The third certified question asks which approach Massachusetts would follow in determining the point at which actual injury or damage to property takes place under the policy provisions in this case.[9] The certifying judge identified six

[9]The full statement of the judge's question appears below:

"3. *The 'Trigger' Issue*

"In the body of this opinion, this Court has held that the 'occurrence' provisions of the insurance policies here at issue require that the injury must take place during the policy period in order for coverage to be pro-

so-called "trigger theories" that have been adopted by various courts, and the parties collectively have urged this court to consider three of those theories.[10]

We agree with the certifying judge that "[a] crucial factor in determining when an injury occurs for purposes of insurance coverage is the nature of the injury." *Acushnet River*, 725 F. Supp. at 1276. On the record before us, there are substantial issues of fact as to the nature and scope of the property damage the sovereigns will seek to prove. See *id*. at 1272, 1276-1277. Indeed, the certifying judge himself concluded that the factual record was insufficiently developed to permit him to reach the question of which trigger theory is appropriate. *Id*. Our rule requires that certification orders contain "a statement of all facts relevant to the questions certified and showing fully the nature of the controversy in which the questions arose." S.J.C. Rule 1:03, § 3 (2). We

_____

vided. In addressing when the injury took place in this case, the Court has identified six different approaches, each supported by case citation. These are: the wrongful act theory, the release theory, the injury-in-fact theory, the manifestation theory, the first discovery theory, and the continuous trigger theory. While the most analogous Supreme Judicial Court decision, *Continental Casualty Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 146 . . . rejects the wrongful act theory, it does not provide definitive guidance concerning the manner of determining when the actual injury takes place and thus which policy of insurance provides the coverage. Accordingly, this Court certifies the following query—under the provisions which trigger insurance coverage in the policies at issue in these related cases, what approach is followed under Massachusetts law in determining at what point, or over what period, insurance coverage is to attach?" *Acushnet River*, 725 F. Supp. at 1280.

[10]Under the policies, " 'property damage' means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."

Lumbermens urges us to adopt either the manifestation theory or the first-discovery theory. Belleville argues that the injury-in-fact theory is correct. This court already has rejected the wrongful act theory as contrary to the language of the policy. See *Continental Casualty Co.* v. *Gilbane Bldg. Co.*, 391 Mass. 143, 152 (1984).

have no such statement. Accordingly, we too decline to answer the third question.