**STATE MUTUAL LIFE ASSURANCE CO. OF AMERICA, Plaintiff,**

v.

**LUMBERMENS MUTUAL CASUALTY CO., Defendant.**

Civ. A. No. 90–12505–PBS.

United States District Court, D. Massachusetts.

Jan. 11, 1995.

into unlined pits a quarter century ago in Florida. State Mutual was an unsecured lender to the paint manufacturer. Having disclaimed responsibility at the time the third party action against the insured was filed, Lumbermens continues to deny that it had a duty to defend. State Mutual also asserts claims for breach of contract and violations of Mass.G.L. chs. 93A and 176D. Though Lumbermens also denies that it has a duty to indemnify the insured, pursuant to an earlier procedural order, that duty will be addressed only in passing today. The parties assume that Massachusetts law controls in this diversity action. This court concludes, as a matter of law, that the insurer owed the insured a duty to defend with respect to the 1968, 1969 and 1970 liability policies, but not with respect to the 1971 policy.

## BACKGROUND

This action stems from Lumbermens' 1989 disclaimer of its duty to defend the insured in an environmental action encaptioned *Insilco Corp. v. Maxxam Properties, Inc.*, No. 88–282–CIV–T–15A (D.Fla.). The insured was dragged into the underlying litigation as a third-party defendant by John Hancock Mutual Life Insurance Company. Hancock was one of several defendants being sued by Insilco, which purchased the property on January 30, 1981 in an action seeking response costs under CERCLA, for the discharge of hazardous paint at the former Mary Carter paint plant in Florida, between 1968 and 1972.

MaryAnn Berger, Stephen H. Oleskey, Nicholas B. Carter, Hale & Dorr, Lisa G. Arrowood, Todd & Weld, Boston, MA for plaintiff State Mut. Life Assur. Co. of America.

Janet L.R. Menna, Karl S. Vasiloff, Wm. Gerald McElroy, Zelle & Larson, Waltham, MA for defendant Lumbermans Mut. Cas. Co.

## MEMORANDUM OF DECISION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

SARIS, District Judge.

### INTRODUCTION

Plaintiff, State Mutual Life Assurance Co. of America ("State Mutual"), the insured, brings this action seeking a declaration pursuant to Mass.Gen.L. Ch. 231A that defendant Lumbermens Mutual Casualty Co. ("Lumbermens"), the insurer, owed it a duty to defend and indemnify it for the costs of litigating and settling an action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.* The underlying CERCLA action involved the dumping of paint by a paint manufacturer

### 1. *The Insilco Complaint*

The Insilco complaint alleged the following. The original owner and operator of a paint manufacturing facility was the Mary Carter Paint Company. In May, 1968, it was purchased by another entity and became a corporate entity called Mary Carter Industries, Inc. The site had been operated as a paint manufacturing company throughout the 1950s and 1960s. After subsequent changes in ownership, Insilco eventually purchased the site on January 30, 1981, and on January 22, 1988, signed an administrative consent order with the Florida Department of Envi-

ronmental Regulation "to remove environmental contamination from the groundwater and soils at the site." The cause of the environmental contamination which was the subject of the consent order was "the disposal of hazardous industrial waste on the site during the time that the Mary Carter Paint Company owned the site and operated the paint manufacturing facility on the site." The complaint sought response costs pursuant to CERCLA, including the remedial costs of work performed pursuant to the consent order, the cost of environmental studies, and attorneys' fees. The basis for the claim against John Hancock was unstated.

### 2. The Hancock Third–Party Complaint

The Hancock third-party complaint against State Mutual and Massachusetts Mutual Life Insurance Company alleges the following. The 1968 purchase of the Mary Carter Paint Company was part of a "leveraged buy-out" transaction whereby the investors formed a new corporation and borrowed money from unsecured lenders, including State Mutual. Although it "never owned or operated" the site, Hancock stated that State Mutual participated with other lenders in the financing by lending $1.25 million in unsecured loans, and by purchasing class B common stock and preferred stock. Between 1968 and 1973, Mary Carter Industries, Inc. experienced financial difficulties. The principal lenders "monitored their loans closely, consented to the restructuring of the loans and made numerous financial concessions to the borrowers." Throughout this time the site was still being operated as a paint manufacturing facility.

While denying all liability, Hancock claimed that, to the extent that it (Hancock) *was* liable as an "owner or operator" under CERCLA, State Mutual should be held jointly and severally liable under the same theory.

Both Hancock and State Mutual were unsecured lenders to the firm that directly owned and operated the site, Mary Carter Industries, Inc., during some of the years of the alleged discharge. State Mutual's interest in the loan ended on December 14, 1971.

### 3. The Interrogatories Answers

The insurer also had information from Insilco's answers to interrogatories that Hancock received notices of and attended meetings of Mary Carter's Board of Directors; interviewed candidates for president and chief executive officer; received financial analyses; visited the Tampa site; met extensively with the vice president of operations, and other officers, to discuss manufacturing operations; hired a management consultant to conduct marketing analyses; met with plant personnel to review the results of cost containment programs; participated in a lender committee formed to make suggestions to management and review plant operations; and performed the functions of the Board of Directors. The interrogatories contained no information about State Mutual or about the nature or circumstances of the release of the hazardous substances.

### 4. The Amended Complaint

Insilco's motion to amend its complaint was allowed in part on May 17, 1990—after Lumbermens twice disclaimed its duty to defend—and the amended complaint was filed. Although it named State Mutual as a defendant, it was never served on State Mutual because settlement discussions were in progress. With respect to State Mutual, the amended complaint alleges only that it was a lender to Mary Carter Industries, Inc. in 1968; and "on information and belief also became involved in the affairs and management of the site thereafter." With respect to Hancock, the allegations of operational involvement are more specific. Subsequent to the 1968 loan, Hancock allegedly became involved in the affairs and management of the site: selecting key management personnel of Mary Carter Industries, Inc.; attending Board of Directors meetings, among them meetings at which the President was elected; developing management and financial plans for the site; and, in general, performing the functions of a Board of Directors for operations at the site.

### 5. Lumbermens' Disclaimer

The following facts are undisputed unless otherwise noted. State Mutual notified

Lumbermens on July 24, 1989 of its claim and forwarded Hancock's complaint, Insilco's complaint, and Insilco's answers to Hancock's first set of interrogatories. On September 15, 1989, Lumbermens wrote to State Mutual, stating that it was able to locate only the 1975 and 1976 policies, and setting forth the reasons for its denial of a defense or indemnification as to those policies. On October 27, 1989, State Mutual forwarded copies for the years 1969 through 1980, as well as documents evidencing the existence of a 1968 policy. It also forwarded the proposed amended complaint.

On January 16, 1990, Lumbermens disclaimed a duty to defend or indemnify under the 1968 policy in light of the "absence of documentation" and restated the same reasons for denial of coverage which it had enunciated in the first letter: (1) that the contamination of the paint site was not "property damage" as defined in the policies; (2) that the policies do not afford coverage for response costs and cleanup; (3) that the discharges were not sudden and accidental and therefore fell within the pollution exclusion of certain of the policies; (4) that the allegations of the third party complaint, that State Mutual took "active control and management" of Mary Carter Industries, place it within the exclusions of the policies; and (5) that the policies exclude coverage for premises alienated by the insured.

Lumbermens' decision to deny coverage was based on the allegations against State Mutual, the available policy information, and the materials supplied by State Mutual. There is no evidence it conducted any factual investigation of the claims made against State Mutual. (Although Lumbermens disputes this, it provides no record citation to demonstrate any investigation).

State Mutual took no action with respect to seeking coverage based on the first amended complaint. There is no evidence as to whether Lumbermens learned prior to settlement whether the proposed complaint was ever filed.

On August 14, 1990, the Insilco action settled before trial. State Mutual incurred $215,409.96 in legal fees in defending the Insilco action, and contributed $131,361.44 to the settlement.

In the action before this Court filed on September 11, 1990, the insured seeks redress for the insurer's refusal to defend or indemnify it, including punitive damages under Mass.Gen.Laws ch. 93A. Both parties move for summary judgment.

## DISCUSSION

### 1. Summary Judgment Standard.

A motion for summary judgment must be granted if:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "It is apodictic that summary judgment should be bestowed only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law." *In re Varrasso*, 37 F.3d 760, 762 (1st Cir.1994) (citing cases).

"To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* (citations omitted). The nonmovant cannot simply rest upon mere allegations. *Id.* Instead, the nonmoving party must adduce specific, provable facts which establish that there is a triable issue. *Id.* Rule 56(e) "requires nonmovants to submit evidence that would be admissible at trial to oppose properly submitted motions for summary judgment." *FDIC v. Fonseca*, 795 F.2d 1102, 1110 (1st Cir.1986). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers, supra* (quoting *Anderson v. Liberty Lob-*

*by, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)).

### A. *1968 Policy*

■ The insurer argues that there is a genuine issue of material fact as to the existence and terms of the 1968 comprehensive general liability policy it allegedly wrote on behalf of the insured.

The existence of the 1968 policy cannot be verified directly, because it is nowhere to be found. However, there is a wealth of indirect evidence of its existence. State Mutual has produced correspondence and documents making reference to a 1968 policy of the same number, and to a document effective January 1, 1969 renewing the general liability policy of the previous year.

The insurer argues that the terms of the apparently misplaced policy cannot be constructed by guesswork. The insured responds that the 1968 policy did not contain a pollution exclusion clause for several reasons. First, the 1969 and 1970 policies issued by insurer did not contain such an exclusion. Second, the basic, industry-wide policy form used in 1968 did not contain such an exclusion, and the policies issued by insurer track the basic forms. Third, scholars believe that the pollution exclusion clause was not coined until 1970. *See* John D. Vishneski, et al., *The Insurance Industry's 1970 Pollution Exclusion,* 23 Loy.U.Chi.L.J. 67, 71 (1991).

"While it is true that a general rule of contract construction is that contracts should be construed as a whole, when the court is satisfied that an original document is not available, the party seeking to prove the content may offer secondary evidence to determine the content of the contract." *See Polaroid Corp. v. Rollins Env. Services (NJ), Inc.,* 416 Mass. 684, 690, 624 N.E.2d 959, 963 (1993). The parties do not present contradictory evidence, which might call for factfinding inappropriate on a motion for summary judgment. Rather, they differ over the proper inference to be drawn from a cornucopia of circumstantial evidence, all pointing in the same direction, in the absence of direct evidence. On the record given, this court concludes that only one inference could properly be drawn. The doubts raised by defendant about the existence and terms of the 1968 policy therefore do not rise to the level of a genuine fact dispute. *Cf., e.g., In re Varrasso,* 37 F.3d at 764 (summary judgment appropriate where circumstantial evidence establishes requisite element beyond hope of contradiction); *Blanchard v. Peerless Ins. Co.,* 958 F.2d 483, 488 (1st Cir.1992) (summary judgment appropriate where only one inference can be drawn from totality of circumstances revealed by undisputed evidence). Even drawing all reasonable inferences in favor of the nonmoving party, this court concludes based on the undisputed evidence that the 1968 policy existed, and that it resembled the 1969 and 1970 policies in all material respects.[1]

### B. *The Duty To Defend*

■ "A liability insurer has a duty to defend third-party actions against an insured if the allegations in the third-party complaint are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms." *Trustees of Tufts University v. Commercial Union Ins. Co.,* 415 Mass. 844, 847, 616 N.E.2d 68, 71 (1993). "[T]he duty to defend is based on the facts alleged in the complaint *and those facts which are known by the insurer.*" *Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co.,* 406 Mass. 7, 10–11, 545 N.E.2d 1156, 1158 (1989) (emphasis added); *see also Terrio v. McDonough,* 16 Mass.App. Ct. 163, 167, 450 N.E.2d 190, 193 (1983) ("Courts operating under notice pleading have generally determined that there is no duty to defend unless facts alleged in the complaint *or known or readily knowable by the insurer,* place liability within the coverage of the policy.") (emphasis added). The duty to defend is broader than the duty to indemnify, and the underlying complaint " 'need only show … a possibility that the liability claim falls within the insurance coverage.' " *Liberty Mutual Ins. Co. v. SCA*

---

1. All disputes concerning policies other than those written in 1968, 1969, 1970, and 1971 are immaterial.

*Services, Inc.*, 412 Mass. 330, 337, 588 N.E.2d 1346, 1350 (1992), (quoting *Sterilite Corp. v. Continental Cas. Co.*, 17 Mass.App.Ct. 316, 319, 458 N.E.2d 338, 341 (1983), *rev. denied*, 391 Mass. 1102, 459 N.E.2d 826 (1984)).

### 1. *Occurrence*

■ All four of the liability policies written by the insurer during the relevant period undertake to defend the insured in actions arising from an "occurrence," subject to certain exclusions. An "occurrence" is defined in all four policies as

an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

*E.g.*, Plaintiff's Exh. 5. In analyzing an identical definition of "occurrence", the Massachusetts Supreme Judicial Court ("SJC") has held: "In deciding whether there was an occurrence ... the focus of the inquiry is on the property damage, asking whether it was expected or intended from the insured's point of view." *Lumbermens Mut. Cas. v. Belleville Inds.*, 407 Mass. 675, 679, 555 N.E.2d 568, 571 (1990). The inquiry focuses on the foreseeability of the *damage caused by the discharge*, not on the foreseeability of the discharge itself. *See A. Johnson & Co., Inc. v. Aetna Cas. & Surety Co.*, 933 F.2d 66, 72 n. 9 (1st Cir.1991) (holding that under Maine law, the "occurrence" provision focuses on the property damage after the initial discharge and whether it was expected or intended from the insured's point of view).

■ The court must evaluate Lumbermens' duty to defend based on the allegations in the underlying complaint, third party complaint and interrogatories, as well as any facts known or readily knowable by the insurer. The complaint in the underlying action alleges that the manufacturer disposed of hazardous wastes at a time when all players in the paint industry had reason to know of the potential adverse environmental effects of such a practice. *Cf. Travelers Ins. Co. v. Waltham Industrial Labs. Corp.*, 883 F.2d 1092, 1099 (1st Cir.1989) (concluding on comparable facts that manufacturer intended or expected damage cause by dumping of

chemicals used in electroplating). Answers to interrogatories further allege that Hancock (not State Mutual) was actively involved in the management of the manufacturer. In the third party complaint, Hancock denies owner or operator status, states it was an unsecured lender, and that State Mutual, also an unsecured lender, was liable to the extent it was.

Based on these factual allegations, this court concludes that the insurer had no factual basis for believing, at the time of disclaimer, that the dumping of paint into unlined pits and ditches was expected or intended by State Mutual. Even if the proposed amended complaint were properly considered by the insurer in determining whether Lumbermens had a duty to defend, it did not preclude the possibility of a duty to defend. Knowledge of the manufacturer's disposal practices and of the attendant dangers cannot be imputed to the insured simply because executives from the insured took an active interest in the manufacturer's management, and expressed a broad intent to deal with its "problems." There is no evidence suggesting that State Mutual participated in any decisions regarding disposal of the paint. *Contrast St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195, 1202 (1st Cir.1994) ("We see no error in presuming that a party arranging to have its waste disposed of by a licensed hauler would not find it fortuitous, unforeseen, unusual or otherwise contrary to its expectations, that its waste was disposed of at a landfill."). So far as the insurer could tell at the time of disclaimer, the discharge constituted a covered "occurrence" " 'even if caused by the deliberate act of a third party.' " *Cf. CPC International, Inc. v. Northbrook Excess & Surplus Ins. Co.*, 962 F.2d 77, 85 (1st Cir.1992) (quoting New Jersey case law).

The conclusion is ineluctable that—even taking as true the most extreme descriptions of Hancock's involvement with the manufacturer and assuming that State Mutual's involvement was the same—the allegations in the pleadings established the possibility of an occurrence within the coverage terms of State Mutual's insurance policy with Lumbermens.

### 2. *Owned Property Exclusion*

■ The insurer argues that it had no duty to defend the action arising out of that occurrence because the allegations clearly fell within the scope of the "owned property" exclusion. Once basic insurance coverage is established, the burden shifts to the insurer to prove the applicability of the coverage exclusion. *See, e.g., Camp Dresser & McKee, Inc. v. Home Ins. Co.,* 30 Mass.App.Ct. 318, 321, 568 N.E.2d 631, 633 (1991). All four of the disputed policies excluded coverage for property damage to:

1) property owned by or rented to the insured,

2) property used by the insured, or

3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control.

*E.g.,* Plaintiff's Exh. 5. In support of the contention that the insured "owned" the property within the meaning of the policies, the insurer points to the allegation in the proposed amended complaint that the insured was actively involved in the operations of the paint manufacturer, and the legal theory that these allegations support—that the insured was an "owner/operator" within the meaning of CERCLA.

The SJC recently rejected a similar argument. In *Tufts,* 415 Mass. at 844, 616 N.E.2d at 68, the underlying complaint alleged that the insured "owned and/or operated" a facility on the contaminated site, for purposes of CERCLA. However, the complaint also alleged that the property was actually owned by a wholly owned subsidiary of Tufts, and the trial court found there were no facts in the record justifying piercing the corporate veil. *See Tufts,* 415 Mass. at 852–53 & n. 7, 616 N.E.2d at 74 & n. 7. In holding that the insurer had a duty to defend, the court concluded that the "owned property" exclusion to the insured's general liability policy did not apply: "The facts alleged in the complaint *and those facts known by the insurers* do not establish that Tufts owned the contaminated property." 415 Mass. at 852, 616 N.E.2d at 74 (emphasis added).

If the sole stockholder of a site's owner is not an "owner" for purposes of the "owned property" exclusion—despite the allegation of "owner/operator" status under CERCLA—then a fortiori an unsecured lender to a site's owner does not, without more, qualify for the exclusion. In the case presented, the insurer knew, based on the complaint, that the manufacturer was the actual owner of the site. The notion that a secured lender, let alone an unsecured lender, could have "owner/operator" status was legally in its infancy at the time of disclaimer. *Cf. United States v. Fleet Factors Corp.,* 724 F.Supp. 955, 960 (S.D.Ga.1988), *aff'd* 901 F.2d 1550 (11th Cir. 1990) (setting forth the seminal rule, subject to endless later litigation, that a secured creditor can provide financial assistance and specific management advice to debtors without risking CERCLA liability "if the secured creditor does not participate in the day-to-day management of the business or facility"); *see also United States v. Kayser–Roth Corp.,* 910 F.2d 24, 27 (1st Cir.1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991). *See generally* 42 U.S.C. §§ 9601(20)(a), 9607(a)(2) (setting forth current rule governing CERCLA liability for persons with secured interests).

Lumbermens points to no case support for its contention that an *unsecured* lender can be deemed an owner/operator under CERCLA. But even if the insurer had a reasonable argument that an unsecured lender could be held liable under CERCLA if actively involved in the daily operations of the business, that would by no means compel the conclusion that an unsecured lender would qualify for the "owned property" exception to liability insurance contracts. After all, the government has its own purposes and criteria for designating "owner/operator" status which may be "far different than the intentions of parties to an insurance contract." *Barbara Thomas, as Committee for Frances L. Werner v. Metropolitan Life Ins. Co.,* 40 F.3d 505, 509 (1st Cir.1994). Here, the policy excludes coverage where the property is in the "care, custody or control" of the insured. Thus, even if there is sufficient daily involvement in management decisions to qualify as an operator for CERCLA pur-

poses, this may well be insufficient to establish "control."

This court concludes that the insurer knew (or should have known) that sketchy allegations of operational involvement by an unsecured lender would fall far short of establishing ownership for purposes of insurance law. Taking into account all the facts available at the time, the insurer was unreasonable in believing that it could escape the duty to defend under the "owned property" exclusion.

E. *Pollution Exclusion in 1971 Policy*

Finally, the insurer argues that, even if an occurrence took place, it had no duty to defend the action arising out of that occurrence to the extent that the allegations fell within the scope of the "pollution exclusion" contained in the 1971 policy.[2] The "pollution exclusion" clause, which appears in no form in any of the policies written prior to 1971, excludes:

> coverage for property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is *sudden and accidental.*

Plaintiff's Exh. 8 (emphasis added).

The insurer relies upon its triumph as a litigant in *Belleville.* In that case, the SJC followed those courts that interpret the phrase "sudden and accidental" as having a temporal element. *See Belleville,* 407 Mass. at 680–81 & n. 4, 555 N.E.2d at 572 n. 4. ("Surely, the abruptness of the commencement of the release or discharge of the pollutant is the crucial element."). The insurer reasons that the allegations in hand at the time of disclaimer gave it ample basis for believing that the discharge was intentional and not abrupt and that, under the rule of *Belleville,* such discharges do not come within the "pollution exclusion" clause. "If a

discharge was intentional or not sudden, the pollution exclusion denies coverage. The policy language does not call for the assessment of 'accidental' or 'sudden' from the insured's perspective." *Polaroid Corp. v. Travelers Indem. Co.,* 414 Mass. 747, 752, 610 N.E.2d 912, 915 (1993); *see also A. Johnson,* 933 F.2d at 72 n. 9 ("The 'sudden and accidental' language, unlike the occurrence definition, does not by its terms take account of an insured's status as a passive polluter.").

The insured does not seriously contest that the alleged release was not "sudden," as that term is defined in *Belleville.* Rather, the insured's novel response is that *Belleville* is irrelevant because it had not been decided at the time of disclaimer. At the time of disclaimer, the leading relevant authority in Massachusetts was *Shapiro v. Public Service Mut. Ins. Co.,* which defined the term "sudden" broadly enough to cover the gradual corrosion of an oil tank. *See* 19 Mass.App. Ct. 648, 651–52, 477 N.E.2d 146, 149–50, *rev. denied,* 395 Mass. 1102, 480 N.E.2d 24, 395 Mass. 1105, 482 N.E.2d 328 (1985). *Belleville* rejected the reasoning of *Shapiro* that the word "sudden" was "ambiguous." The insured's theory, then, is that the duty to defend must be determined strictly from an historical vantage point. In support, it invokes the truism that the duty to defend must be determined based upon the facts available to the insurer at the time it is asked to defend. *See, e.g., Sterilite,* 17 Mass.App. Ct. at 323, 458 N.E.2d at 343.

One could imagine different ways to resolve these tensions, at least at the duty to defend stage. For instance, a court might adhere to a strict historical analysis at the duty to defend stage, but, at the duty to indemnify stage, hold the insurer liable under the facts *and the law* as they are. This option has some intuitive appeal, but would in some cases lead to the odd result of conceiving the duty to defend to be *narrower* than the duty to indemnify. *Cf. BSO,* 406 Mass. at 10, 545 N.E.2d 1156 ("It is axiomatic that an insurance company's duty to defend

---

**2.** Defendant has waived its argument with respect to the appropriate "trigger" for coverage in

light of recent case law developments.

is broader than its duty to indemnify."). Adopting this approach would be more than an academic exercise; it might in some cases change the outcome (or the amount of settlement), by moving the key battle lines to the duty to indemnify stage.

Fortunately, there is no need to adjudicate this esoteric dispute, as the SJC has, at least on one occasion, applied the "suddenness" rule announced in *Belleville* retroactively to excuse an insurer from its duty to defend—analyzing a pollution exclusion clause in light of *Belleville* in a case where the insurer disclaimed its duty to defend prior to *Belleville* but after *Shapiro*. *See SCA*, 412 Mass. at 335–36 & n. 5, 588 N.E.2d at 1349, & n. 5 (holding that complaint was not "reasonably susceptible of an interpretation that the release of pollutants was 'sudden and accidental,' where complaint alleged that insured had emptied toxic substances into open barrels in the course of routine business activity" lasting several months). In *SCA*, the SJC dismissed as unsupported the notion that the insurer might be liable, under the *Shapiro* "suddenness" rule, for a limited breach of its duty to defend—a breach running from the time of the disclaimer to the time that *Belleville* was handed down and *Shapiro* ceased to be good law. *Id.* Cf. *Goodman v. Aetna Cas. & Surety Co.*, 412 Mass. 807, 811–12, 593 N.E.2d 233, 235–36 (1992) (applying *Belleville* rule retroactively in context of suit for declaration of duty to indemnify); *St. Paul Fire*, 26 F.3d at 1203 (construing "sudden and accidental" language, an open question under Rhode Island law, and applying it to determine whether insurer had a duty to defend under insurance contracts between 1971 through 1985 in litigation culminating in a 1991 settlement).[3]

While the state of case law at the time of disclaimer is quite relevant to the G.L. ch. 93A claim, the conclusion is inevitable that this court's inquiry as to the duty to defend cannot be conducted in the wooden historical

manner urged by the insured. With respect to the 1971 policy, which contained a standard pollution exclusion clause, the insurer owed no duty to defend.

## F. *Good Faith*

On balance, the insurer's reasons for denying coverage were plausible enough to survive the insured's challenge under Mass.Gen. Laws chs. 93A and 176D. The words of the SJC in rejecting this argument on another occasion are perfectly applicable:

> Liability under G.L. c. 93A is based upon the employment of unfair or deceptive acts or practices.... In good faith, [the insurer] relied upon a plausible, although ultimately incorrect, interpretation of its policy. There is nothing immoral, unethical or oppressive in such an action. Nor is such an action within "the penumbra of some common-law, statutory, or other established concept of unfairness."

*BSO*, 406 Mass. at 14–15, 545 N.E.2d at 1160 (citations omitted); *see also Polaroid*, 414 Mass. at 754, 610 N.E.2d at 916.

■ First, the insured argues that it deserves summary judgment on its claim pursuant to G.L. ch. 93A, because the insurer, in order to preserve its legal rights, was obligated to seek a declaratory judgment at the time of disclaimer, declaring that it had no duty to defend. In *Sterilite*, the Massachusetts Appeals Court (Kaplan, J.) held:

> When, as in the present case, the allegations of the third-party complaint find apparent lodgment in the effective coverage of the policy, the insurer is obligated to defend. But it can, by certain steps, get clear of the duty from and after the time when it demonstrates with conclusive effect on the third party that as matter of fact—as distinguished from the appearances of the complaint and policy—the third party cannot establish a claim within the insurance. Judge L. Hand suggested

---

**3.** The retroactive application of *Belleville* is consistent with the general rule, in Massachusetts as elsewhere, that "changes in the common law brought about by judicial decisions are given retroactive effect." *Halley v. Birbiglia*, 390 Mass. 540, 544, 458 N.E.2d 710, 713 (1983). When the SJC wishes to make a new common

law rule merely prospective in effect, it says so. *See, e.g., Johnson Controls, Inc. v. Bowes*, 381 Mass. 278, 282–83 & n. 4, 409 N.E.2d 185, 188 & n. 4 (1980) (explicitly mandating that new rule announced in the case, upsetting the balance of power between insureds and insurers, be given only prospective effect).

that the demonstration of the precise basis on which the third-party action will proceed may be made by discovery or other tactics within the third-party action, whose defense will have been undertaken by the insurer. *Lee v. Aetna Cas. & Sur. Co.*, 178 F.2d 750, 752 (2d Cir.1949). An insurer may make the demonstration when brought into the third-party action upon impleader by the insured. See, e.g., *Terrio, supra*, 16 Mass.App.Ct. at 164 [450 N.E.2d 190]. A declaratory action, in which the necessary interests are represented, may serve for the demonstration. See *Atlantic Mut. Fire Ins. Co. v. Cook*, 619 F.2d 553, 555 (5th Cir.1980); *Firemen's Fund Ins. Co. v. Chasson*, 207 Cal. App.2d 801, 807 [24 Cal.Rptr. 726] (1962). What is not permitted is that an insurer shall escape its duty to defend the insured against a liability arising on the face of the complaint and policy, by dint of its own assertion that there is no coverage in fact: that insurer then stands in breach of its duty even if the third party fails in the end to support any such claim of liability by adequate proof. See *Babcock & Wilcox Co. v. Parsons Corp.*, 430 F.2d 531, 538–539 (8th Cir.1970).

17 Mass.App.Ct. at 323–324; 458 N.E.2d at 343–44.

Endorsing this analysis, the SJC later held that a declaratory judgment proceeding provides an appropriate procedure for definitively resolving a duty to defend dispute. *See Belleville*, 407 Mass. at 685, 555 N.E.2d at 575. However, the court stopped short of embracing the plaintiffs' position that an insurer's failure to file a declaratory judgment action mandates a conclusion of breach of the duty to defend. Indeed, in *Sterilite* and in *Tufts*, as here, it was the insured, rather than the insurer, that filed the declaratory judgment action.

Second, the insured argues that the insurer's disclaimer was unreasonable in light of applicable law. The insurer has prevailed on its argument with respect to the 1971 policy, and it had a good faith basis for disputing its duty to defend under the 1968 policy, which the insured had lost. Lumbermens' other arguments lack a firm basis in current law, but this Court cannot confidently say that they were implausible at the time of disclaimer. With respect to the owner/operator issue, the court in the *Insilco* action denied motions to dismiss and for summary judgment filed on the ground that a lender is not an owner/operator under CERCLA. Even though the lenders were unsecured, the *Insilco* court was able to conclude, without qualification, that it appeared "clear under the statute and from [the] cases [cited] that where a creditor participates in the management of a site sufficiently to be deemed an operator, then it will be liable under CERCLA." With respect to the "occurrence" issue, the SJC did not definitively define the term until *Belleville* was decided, on June 14, 1990, six months after the disclaimer of the duty to defend. With respect to the definition of property damage (an issue not discussed in the body of this memorandum because the insurer elected to waive it), the SJC did not rule until June 14, 1990 that cleanup costs fall within the definition of property damage. *See Hazen Paper Co. v. United States Fidelity & Guaranty Co.*, 407 Mass. 689, 698, 555 N.E.2d 576, 582 (1990) (acknowledging that other courts have denied coverage for cleanup costs).

Accordingly, plaintiff's motion for summary judgment is denied with respect to the claim that the insurer disclaimed its duty to defend in bad faith. No opinion is expressed with respect to the argument that the insurer disclaimed its duty to indemnify in bad faith.

### G. *A Concluding Word on Remedies*

This court has concluded that the insurer had a duty to defend the insured in the underlying action, under the terms of the 1968, 1969, and 1970 policies, but that it had no such duty under the terms of the 1971 policy. Whether, and to what extent, the insured has a duty to indemnify the insured is an independent question. *See, e.g., BSO*, 406 Mass. at 10, 545 N.E.2d at 1158. As the costs of defense are undisputed, the Court awards partial summary judgment in the amount of $215,409.96 plus interest.

■ The duty to indemnify aside, the insurer is certainly liable for all damages, in addition to defense costs, caused by its

breach of the duty to defend, under standard contract principles. *See Polaroid,* 414 Mass. at 762, 610 N.E.2d at 920–21. However, plaintiff has not presented any evidence of any damages apart from the costs of litigation. Although it makes the unsupported claim that it was forced to settle because of the breach of the duty to defend, there is no evidence or reason to believe that a sophisticated, well-funded entity such as the insured was compelled by financial duress to settle where it would not have otherwise, or to settle for a higher amount.

On the papers before us, this court will not undertake to determine either the existence of the insurer's duty to indemnify, or the amount of damages due for any breach. *See Polaroid,* 414 Mass. at 762, 610 N.E.2d 912 (an insurer that wrongfully declines to defend a claim will have the burden of proving that the claim was not within its policy coverage).

### *ORDER*

Plaintiff's motion for summary judgment (# 9), as renewed in its memorandum of July 25, 1994 (# 59) and subsequent filings, is granted with respect to the duty to defend under the 1968, 1969 and 1970 policies, and the Court orders entry of partial summary judgment in the amount of $215,409.96 plus twelve percent interest computed from August, 1990. Plaintiff's motion is denied with respect to the duty to defend under the 1971 policy, and denied with respect to the claim under Mass.Gen.Laws chs. 93A and 176D to the extent that claim relates to the insurer's breach of the duty to defend. Defendant's cross-motion for summary judgment (# 17), as renewed in its memorandum of July 25, 1994 (# 58) and in subsequent filings, is denied with respect to the duty to defend under the 1968, 1969 and 1970 policies, granted with respect to the duty to defend under the 1971 policy, and granted with respect to the claim under Mass.Gen.Laws chs. 93A and 176D to the extent that claim relates to the insurer's breach of the duty to defend.