**KERR–McGEE CORPORATION, a Delaware corporation, et al., Plaintiffs–Respondents,**

v.

**ADMIRAL INSURANCE COMPANY, et al., Defendants–Petitioners.**

No. 81294.

Supreme Court of Oklahoma.

Oct. 3, 1995.

Rehearing Denied Nov. 16, 1995.

Covington & Burling by Peter J. Nickles and Douglas E. Phillips, Washington, DC, Crow & Dunlevy by Andrew M. Coats, Richard C. Ford and Leanne Burnett, Oklahoma City, for Kerr–McGee Corporation.

Stewart & Elder by A.T. Elder, Jr., Oklahoma City, for Admiral Insurance Co.

Harwood Lloyd by Victor C. Harwood, III, Brian J. Coyle, Edward Zampino, Peter E. Mueller, Hackensack, NJ, Huckaby, Fleming, Frailey, Chaffin & Darrah by F. Thomas Cordell, Jr., John Dexter Marble, Chickasha, for Aetna Casualty & Surety Co.

Mills, Whitten, Mills, Mills & Hinkle by Earl D. Mills, Oklahoma City, Mudge, Rose, Guthrie Alexander & Ferdon, New York City, for California Union Insurance.

Hall, Estill, Hardwick, Gable, Golden & Nelson by Michael D. Graves and Susan L. Gates, Tulsa, for The Hardage Steering Committee Members.

Riggs, Abney, Neal & Turpen by Melvin Hall, Oklahoma City, for Oklahoma State Chamber of Commerce & Industry.

Wiley, Rein & Fielding by Laura A. Foggan, Carol A. Barthel, and William A. McGrath, Washington, DC, Derryberry, Quigley, Parrish, Solomon & Blankenship by Larry Derryberry and Bert E. Marshall, Oklahoma City, for Insurance Environmental Litigation Association.

HODGES, Justice.

The question certified by the trial court is whether a pollution exclusion clause in a general liability insurance contract applies to the long-term disposal of hazardous waste. This Court holds that the exclusion applies and bars coverage.

Kerr–McGee Corporation and related entities (Kerr–McGee) brought this action against 29 American insurance companies, plus certain underwriters at Lloyd's of London and certain London market insurance companies. These companies provided general liability coverage to Kerr–McGee between 1958 and 1985. Kerr–McGee seeks reimbursement of its share of the costs to clean up accumulated contamination at nine sites in five states. Four of the sites were Kerr–McGee plant facilities and five sites were where Kerr–McGee regularly disposed of its industrial waste. It also seeks to recoup the attorney fees it incurred defending claims brought by government agencies who forced the clean-ups.

The insurance companies raised five defenses to coverage. On cross motions for summary judgment, the trial court held that the pollution exclusion clause did not bar coverage. The question was certified for immediate review pursuant to section 952(b)(3) of title 12. This Court granted certiorari review of this issue which will affect a substantial part of the merits of the claims concerning each site. This opinion addresses only the legal effect of the pollution exclusion clause in the policies.

The trial court has decided to try the claims separately for each site. The first site is the Hardage superfund site in McClain County, Oklahoma.

The Hardage site was formerly licensed for hazardous waste disposal. Beginning in 1972, Kerr–McGee sent waste for disposal, primarily wastewater from drum rewashing at Cato Oil and Grease. In 1986, the United States sued Kerr–McGee and others who

disposed of waste at the Hardage site pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675 (1992). In July 1991, Kerr–McGee paid $2,871,245.00 as its proportionate share of remedy and response costs at the site. It incurred defense costs of $923,984.82 and also faces potential future liability under certain contingencies described in the settlement agreement.

Beginning in 1971, a pollution exclusion clause was included in general liability policies. Two versions of the exclusion appear in the applicable policies. The typical version provides:

> In consideration of the premium charged, it is agreed that this insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

(emphasis added). Another version of the clause excludes pollution coverage except for "a sudden, unintended and unexpected happening."

The trial court held the term "sudden" to be ambiguous as a matter of law. It stated that "the clause in question is susceptible to at least two varying constructions and [this court] will adopt the usage most favorable to Kerr–McGee." The trial court did not construe the term "accidental."

■ The law is settled concerning the subject of ambiguity in contracts. "The interpretation of an insurance contract and whether it is ambiguous is a matter of law for the Court to determine and resolve accordingly." *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla.1991). Unless the insurance contract is ambiguous, it should be construed according to its terms, as is true of any other contract. *Frank v. Allstate Ins. Co.*, 727 P.2d 577 (Okla.1986). If the language in the insurance policy is susceptible to two constructions, then the contract will be interpreted consistent with the mutual intent of the parties, with the ambiguity resolved most favorably to the insured and against the insurance carrier. *Dodson*, 812 P.2d at 376–77; *United States Fidelity & Guar. Co. v. Town of Comanche*, 114 Okla. 237, 246 P. 238 (1926).

Whether the pollution-exclusion clause bars coverage in a general liability contract is an issue of first impression in this jurisdiction. However, the case law construing the pollution exclusion clause is voluminous. A review of those cases reveals that the arguments advanced by the insurance companies, Kerr–McGee, and the amici are neither new nor being considered for the first time.

## I. "SUDDEN"

■ A number of courts have addressed the issue of whether the pollution exclusion clause is ambiguous. Their holdings differ as to whether the term "sudden" is susceptible to more than one meaning. State high courts addressing the issue are evenly split. Seven have construed "sudden" to mean unexpected, unintended, or unforeseen.[1] That was the conclusion the trial court reached in this matter. Seven state high courts, however, have concluded that "sudden" has a temporal element that connotes abruptness or immediacy.[2] A number of intermediate ap-

1. *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1092 (Colo.1991); *Claussen v. Aetna Casualty & Sur. Co.*, 259 Ga. 333, 380 S.E.2d, 686, 690 (1989); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 705, 607 N.E.2d 1204, 1218 (1992); *Greenville County v. Insurance Reserve Fund*, 443 S.E.2d 552, 553 (S.C.1994); *Queen City Farms, Inc. v. Central Nat'l Ins. Co.*, 126 Wash.2d 50, 882 P.2d 703, 720 (1994); *Joy Technologies, Inc. v. Liberty Mut. Ins. Co.*, 187 W.Va. 742, 421 S.E.2d 493, 500 (1992); *Just v. Land Reclama-*

*tion, Ltd.*, 157 Wis.2d 507, 456 N.W.2d 570, 578 (1990).

2. *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.*, 636 So.2d 700, 704 (Fla.1993); *Lumbermens Mut. Casualty Co. v. Belleville Indus., Inc.*, 407 Mass. 675, 555 N.E.2d 568, 572 (1990); *Protective Nat'l Ins. Co. v. City of Woodhaven*, 438 Mich. 154, 476 N.W.2d 374, 376 (1991); *Board of Regents v. Royal Ins. Co. of America*, 517 N.W.2d 888, 892 (Minn.1994); *Waste Manage-*

pellate courts have also reached that conclusion.[3] Most federal appellate courts confronted with the issue have held that "sudden" connotes temporal abruptness.[4] That includes the Tenth Circuit Court of Appeals which reached that same conclusion in examining a pollution exclusion clause. *See Hartford Accident & Indem. Co. v. United States Fidelity & Guar.*, 962 F.2d 1484, 1489 (10th Cir.1992). That was also the conclusion reached in five federal district court decisions from the Western District of Oklahoma which construed pollution exclusion clauses in policies covering the same Hardage waste disposal site involved here.[5]

Independent of the differing conclusions of courts, the Oklahoma Statutes provide specific rules of contract interpretation. First, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practical, each clause helping to interpret the others." Okla.Stat. tit. 15, § 157 (1991). Second:

> The words of a contract are to be understood in their ordinary and popular sense,

rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.

*Id.* at § 160. Thus, the term "sudden" must be viewed in the context of the contract and must be given its plain ordinary meaning. "[N]either forced nor strained construction will be indulged, nor will any provision be taken out of context and narrowly focused upon to create and then construe an ambiguity so as to import a favorable consideration to either party than that expressed in the contract." *Dodson* 812 P.2d at 376.

The ordinary and popular meaning of "sudden" necessarily includes an element of time. Decisions finding ambiguity have focused on technical distinctions crafted by lawyers rather than the ordinary understanding of the word. A finding of ambiguity requires that the term "sudden" be lifted from its context in the policy and scrutinized so closely that any plain meaning is no longer discernable. "An appellate court should not

---

*ment of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 340 S.E.2d 374, 382 (1986); *Morton Int'l, Inc. v. General Accident Ins. Co. of America*, 134 N.J. 1, 629 A.2d 831, 847 (1993); *Hybud Equipment Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St.3d 657, 597 N.E.2d 1096, 1102 (1992) *cert. denied* 507 U.S. 987, 113 S.Ct. 1585, 123 L.Ed.2d 152 (1993).

**3.** *See Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal.App.4th 715, 15 Cal.Rptr.2d 815, 840–41 (1993); *ACL Technologies, Inc. v. Northbrook Property & Casualty Co.*, 17 Cal.App.4th 1773, 22 Cal.Rptr.2d 206, 212 (1993); *Barmet of Indiana, Inc. v. Security Ins. Group*, 425 N.E.2d 201, 203 (Ind.Ct.App.1981); *Borg–Warner Corp. v. Insurance Co. of North America*, 174 A.D.2d 24, 577 N.Y.S.2d 953, 957 (1992); *Technicon Elecs. Corp. v. American Home Assurance Co.*, 74 N.Y.2d 66, 544 N.Y.S.2d 531, 533, 542 N.E.2d 1048, 1049–50 (1989); *Transamerica Ins. Co. v. Sunnes*, 77 Or.App. 136, 711 P.2d 212, 214 (1985); *Lower Paxon Township v. United States Fidelity & Guar. Co.*, 383 Pa.Super. 558, 557 A.2d 393, 398 (1989); *Techalloy Co. v. Reliance Ins. Co.*, 338 Pa.Super. 1, 487 A.2d 820, 827 (1984).

**4.** *See Aeroquip v. Aetna Casualty & Sur. Co.*, 26 F.3d 893, 894 (9th Cir.1994); *Aetna Casualty & Sur. Co. v. General Dynamics Corp.*, 968 F.2d 707, 710 (8th Cir.1992); *Ogden Corp. v. Travelers Indem. Co.*, 924 F.2d 39, 42 (2d Cir.1991); *A. Johnson & Co. v. Aetna Casualty & Sur. Co.*, 933 F.2d 66, 72 (1st Cir.1991); *Northern Ins. Co. v.*

*Aardvark Assocs., Inc.*, 942 F.2d 189, 193 (3d Cir.1991); *FL Aerospace v. Aetna Casualty & Sur. Co.*, 897 F.2d 214, 219 (6th Cir.1990).

Those federal appellate court decisions holding to the contrary have been bound by state law precedent or unusual state law rules governing policy interpretation. *See Broderick Investment Co. v. Hartford Accident & Indem. Co.*, 954 F.2d 601 (10th Cir.1992) (following Colorado law found in *Hecla Mining*, 811 P.2d 1083); *CPC Int'l v. Northbrook Excess & Surplus Ins. Co.*, 962 F.2d 77 (1st Cir.1992) (following New Jersey law found in *Broadwell Realty Serv., Inc. v. Fidelity & Casualty Co.*, 218 N.J.Super. 516, 528 A.2d 76 (App.Div.1987). *See also New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162 (3d Cir.1991) (Delaware rules of policy interpretation allowing extrinsic evidence surrounding meaning of what appears to be clear and unambiguous language).

**5.** *See Oklahoma Publishing Co. v. Kansas City Fire & Marine Ins. Co.*, 805 F.Supp. 905, 909 (W.D.Okla.1992) *appeal dismissed*, No. 92–6391 (10th Cir. June 8, 1993); *Magnetic Peripherals, Inc. v. Hartford Ins. Co.*, No. CIV–92–1651–W (W.D.Okla. Apr. 20, 1993); *United States v. Hardage*, No. CIV–86–1401–W (W.D.Okla. Mar. 29, 1993); *Macklanburg–Duncan v. Aetna Casualty & Sur. Co.*, No. CIV–92–1650–A (W.D.Okla. Mar. 29, 1993); *Downtown Airpark, Inc. v. Continental Ins. Co.*, No. CIV–91–673–L (W.D.Okla. Mar. 22, 1993).

strain to create an ambiguity where, in common sense, there is none." *Farm Bureau Mut. Ins. Co. v. Laudick,* 18 Kan.App.2d 782, 859 P.2d 410, 412 (1993) (citing *Bell v. Patrons Mut. Ins. Ass'n,* 15 Kan.App.2d 791, 816 P.2d 407, 409 (1991). Clearly, the ordinary meaning of "sudden" cannot describe the gradual routine disposal of industrial waste that occurred over a number of years.

Further, the trial court defined "sudden" to mean "unexpected or unintended." But that definition also fits the term "accidental." *See United States Fidelity & Guar. Co. v. Briscoe,* 205 Okla. 618, 239 P.2d 754, 757 (1951) (accident is an "unexpected event"). The trial court's construction of "sudden" would add nothing to the term "accidental." It would make the term "sudden" mere surplusage. In order to give effect to each part of the contract, "sudden" and "accidental" must be read as two separate conditions for coverage under the policy.

## II. "ACCIDENTAL"

■ The second condition for coverage under the policies is the "accidental" requirement. The insurance companies argue that the term "accidental" applies to the disposal of pollutants. Kerr–McGee argues that it is the damage caused to third parties that must be accidental, even if the disposal was intentional.

■ The pollution exclusion clauses in the policies state that there is coverage only if the "discharge, dispersal, release or escape [of pollutants] is sudden and accidental" or, in the words of some policies, if "seepage, pollution or contamination is caused by an unintended or unexpected happening." The focus of that language is not on whether the polluter knew its waste could hurt the environment, but rather whether the "discharge, dispersal, release or escape" was unexpected or unintended. Kerr–McGee's long-term disposal of industrial waste was neither sudden nor accidental. The trial court erred in holding otherwise.

■ Because the terms "sudden" and "accidental" in the pollution exclusion clauses are unambiguous, no extrinsic evidence is needed to determine the intent of the parties at the time the policy was issued. The trial court erred in granting summary judgment to Kerr–McGee and denying summary judgment to the insurance companies. The cause is remanded to the trial court with instructions to enter summary judgment in favor of the insurance companies.

REVERSED AND REMANDED WITH INSTRUCTIONS.

Concur: KAUGER, V.C.J., and HODGES, LAVENDER, SIMMS, SUMMERS and WATT, JJ.

HARGRAVE, J., Concurs in Result.

WILSON, C.J., and OPALA, J., dissent.

OPALA, Justice, dissenting.

I must recede from today's opinion because the court's construction of the critical pollution coverage clause should *follow* rather than *precede* the trial court's judgment in the case. This has been my undeviating position ever since the trial court's certified interlocutory order came to be tendered for our certiorari review. I would hence recall the writ and deny the petition for certiorari as improvidently granted.

ALMA WILSON, Chief Justice, dissenting, with whom OPALA, Justice, concurs in result:

I must respectfully dissent to today's ruling for two reasons. First, the opinion turns on the disposal of waste at the licensed Hardage site, rather than the critical fact of the discharge, dispersal, release or escape of contaminants into or upon the land, atmosphere or waters. Second, summary judgment on the insurance coverage is premature.

This litigation involves more than two dozen insurers, over fifty insurance contracts written from 1958 until 1985, and multi-million-dollar liability for environmental cleanup of nine sites in five states. By summary judgment motions, each side asked the trial court to determine whether the environmental cleanup liability of plaintiffs/respondents (Kerr–McGee) is excluded from coverage in the comprehensive general liability and excess liability insurance contracts. The trial

court entered partial summary judgment on two of the defenses raised by defendants/petitioners (insurers).[1] We granted certiorari to review the trial court's interlocutory order that "sudden" is ambiguous and, for trial purposes, the term "sudden" as used in the pollution-exclusion clauses will be defined as "unexpected." [2]

## I.

The majority opinion phrases the question certified as "whether a pollution exclusion clause in a general liability insurance contract applies to the long-term disposal of hazardous waste." That is not the issue decided by the trial court. The two-prong question certified is whether the word "sudden" in the pollution-exclusion clause creates an ambiguity, and if so, what meaning should be assigned.

1. The partial summary judgment order states that the defenses raised by the insurers include: 1) the cleanup costs are excluded as ordinary costs of doing business; 2) the cleanup costs are excluded by the pollution-exclusion clauses; 3) liability for owned-property is excluded from coverage; 4) notice of the liability to the insurance companies was unreasonably late; 5) the insurers have no duty to defend against liability not included in the coverage; and, 6) Kerr–McGee breached the cooperation clauses in the insurance policies by entering into settlement agreements.

2. The order of certification from the trial court presents the issue as follows:

> ... This Court found that the pollution exclusion clauses at issue were "ambiguous as a matter of law," and held that the word "sudden" as used in the clauses meant, "unexpected, unintended or unforeseen," as argued by the Plaintiffs rather than "quick or abrupt" as argued by the Defendants and that the exclusions did not bar coverage for claims related to Hardage/Criner.

3. This case involves nine sites in five states:

1. The Hardage site in Criner, Oklahoma, owned and operated by Royal N. Hardage and licensed by the State Department of Health. The Hardage site was operated from 1972 until 1980, during which time Kerr–McGee disposed of waste at the site, primarily waste-water from a drum-rewashing operation at Cato Oil & Grease. Kerr–McGee has paid $2.8 million in cleanup costs.

2. A site near Cushing, Oklahoma, where Kerr–McGee operated an oil refinery and processed nuclear products. Kerr–McGee deposited

## II.

Most, if not all, of the environmental cleanup costs involved herein are imposed by the Comprehensive Environmental Response and Cleanup Liability Act (CERCLA) which was originally enacted in 1980. 42 U.S.C. §§ 9601, et seq. CERCLA provides for federal response to environmental problems of national magnitude and imposes responsibility and strict liability for waste disposal. The United States sued Kerr–McGee, and other parties, to recover cleanup costs at various sites located in several states.[3] Kerr–McGee made claims under its comprehensive general liability insurance contracts for the insurers to indemnify it for the cleanup costs and litigation expenses. The insurance companies denied the claims. Kerr–McGee sued the insurance companies for breach of its liability insurance contracts issued from 1958

waste into sludge pits at the site and Skull Creek during the period from 1965 to 1966.

3. A site in West Chicago, Illinois, where Kerr–McGee Chemical operated a thorium processing plant and stored thorium waste from 1932 to 1973, subject to regulation by the Atomic Energy Commission. Kerr–McGee has paid an estimated $20 million in cleanup costs.

4. The Sauget site in St. Clair, Illinois, where Kerr–McGee operated a wood-treating plant from 1927 to 1969. Waste containing creosote, used to treat railroad ties, telephone poles, etc., was discharged onto the surface of the surrounding grounds.

5. A site in Milwaukee, Wisconsin, where Kerr–McGee operated a wood-treating plant from 1921 until 1976. Creosote waste was deposited into ditches leading into the Little Menomonee River. Kerr–McGee has paid $26 million in cleanup costs.

6. A site in Jacksonville, Florida, where Kerr–McGee operated a pesticide and fertilizer plant from 1970 until 1978. Waste containing sulfuric acid was stored at the site. Kerr–McGee has paid $436 thousand in cleanup costs.

7. The Pickettville Road Landfill outside Jacksonville, Florida, where Kerr–McGee disposed of waste from its pesticide and fertilizer plant. Kerr–McGee is listed a potentially responsible party liable for cleanup costs under CERCLA.

8. The Gulf Coast Fertilizer Site in Cottondale, Florida, where sulfuric acid was produced and waste was discharged into surface ponds, for which Kerr–McGee may be a responsible party.

9. The Sac River and Fulbright Landfill sites near Springfield, Missouri, operated by the City of Springfield. The City has alleged that Kerr–McGee disposed of waste containing creosote at the landfills.

to 1985. Because of the complexity of the claims and defenses, the trial court determined to try separately the claims for each of the nine sites. The first claim to be tried will involve the Hardage site at Criner, Oklahoma.[4] Parties on both sides filed summary judgment motions. The trial court considered the motions as they related to the Hardage site and entered rulings on two of the defenses.

## III.

The pollution-exclusion clause reads:

### EXCLUSION

### (CONTAMINATION OR POLLUTION)

IN CONSIDERATION OF THE PREMIUM CHARGED, IT IS AGREED THAT THE INSURANCE DOES NOT APPLY TO *BODILY INJURY* OR *PROPERTY DAMAGE* ARISING OUT OF THE DISCHARGE, DISPERSAL, RELEASE OR ESCAPE OF SMOKE, VAPORS, SOOT, FUMES, ACIDS, ALKALIS, TOXIC CHEMICALS, LIQUIDS OR GASES, WASTE MATERIALS OR OTHER IRRITANTS, CONTAMINANTS OR POLLUTANTS INTO OR UPON LAND, THE ATMOSPHERE OR ANY WATERCOURSE OR BODY OF WATER; BUT THIS EXCLUSION DOES NOT APPLY IF SUCH DISCHARGE, DISPERSAL, RELEASE OR ESCAPE IS SUDDEN OR ACCIDENTAL.

The meaning of the word "sudden" as used in the exclusion is at issue herein. The insurers assert that "sudden" is not ambiguous and that "sudden" means "abruptly or quickly." Kerr–McGee asserts that "sudden" is ambiguous and that it should be interpreted to mean "unexpected or unintended." The trial court found "sudden" to be ambiguous and assigned the meaning urged by Kerr–McGee.[5]

The majority opinion finds "sudden" is unambiguous and assigns meaning pursuant to well-established rules of construction.[6] The majority, however, does not look to the whole of the insurance contracts, nor does it eliminate any special usage, in assigning meaning to the word "sudden." Rather, the majority chides sister state courts that have found "sudden" to be ambiguous because they focused on "technical distinctions crafted by lawyers," and declares that "the meaning of 'sudden' cannot describe the gradual routine disposal of industrial waste that occurred over a number of years." In so doing, the majority misperceives the focus of "sudden and accidental" as used in the pollution-exclusion clause. The exclusion, fully set forth above, takes away liability coverage for damage caused by the release of pollutants into the environment; then it restores coverage for damages where the release is "sudden and accidental." The exclusion is silent as to long-term disposal of waste at a licensed waste site by the insured.

4. In 1986, the United States sued Kerr–McGee and others who had disposed of waste at the Hardage site. Kerr–McGee and numerous other parties were ultimately held jointly and severally liable for cleanup. In July of 1991, Kerr–McGee paid $2,871,245.00 as its proportionate share of remedy and response costs at the site. It incurred defense costs of $923,984.82 and also has potential future liability under certain contingencies described in the settlement agreement.

5. The trial court's ruling is consistent with our extant law. If the language in the insurance policy is susceptible to two constructions, then the contract will be interpreted consistent with the mutual intent of the parties, with the ambiguity resolved most favorably to the insured and against the insurance carrier. *Dodson,* 812 P.2d 372, 376–377 (Okla.1991); *U.S. Fidelity & Guaranty Co. v. Town of Comanche,* 114 Okla. 237, 246 P. 238 (1926). This is especially true of

language in a policy that would exclude liability, *Dodson,* 812 P.2d at 377. Even where the insurance company is dealing with a large corporation, sophisticated and counseled in insurance matters, most policies are standard-form, worded very similarly, and offered on a take-it-or-leave-it basis. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 121–122, 607 N.E.2d 1204, 128–1219, 180 Ill.Dec. 691, 705–706 (1992).

6. The meaning of the parts of an insurance contract should be ascertained from the entirety or whole of the contract. 15 O.S.1991, § 157; 36 O.S.1991, § 3621; *Dodson v. St. Paul Ins. Co.,* 812 P.2d 372, 376 (Okla.1991); and *Frank v. Allstate Ins. Co.,* 727 P.2d 577 (Okla.1986). And, undefined words are to be assigned the popular and ordinary meaning unless they are used in a technical sense by the parties or a special meaning is given to them by usage. 15 O.S.1991, § 160.

Upon review of the voluminous summary judgment record, I agree with the majority that technical distinctions have been crafted. I do not agree that the lawyers in this or similar litigation crafted the distinctions. The policies are drafted so as to require serious scrutiny to ascertain meaning of any of the terms.[7] A summary of the pertinent insuring and definition provisions in three of the policies demonstrates the lack of clarity of the insurers' language:

1. The 1957 comprehensive general liability insurance policy issued by American Motorists Insurance Company provided liability coverage for accidents. By endorsement, sudden or continuous exposure to conditions was deemed to be an accident, but the coverage for exposure damage was limited to damages that the insured did not know would occur.[8] The 1957 policy had no pollution-exclusion clause.

2. The 1965 comprehensive general liability insurance policy issued by Aetna Casualty and Surety Company provided liability coverage for occurrences. "Occurrence" was defined as an accident or exposure for which the damage was not expected nor intended by the insured.[9] Like the 1957 policy, liability coverage was provided for accident-caused damages or accident-resulting damages. "Sudden" is not used in the pertinent provisions and there was no pollution-exclusion clause in the 1965 policy.

7. The voluminous summary judgment record contains several of the involved insurance contracts, dating from 1957 to 1983. Each policy consists of at least 75 pages with numerous coverage and exclusion endorsements. The insuring provisions, definitions and pollution exclusion clauses appear to be in prepared or standard insurance policy form.

Inquiry into intent at the time of contracting or technical meaning would likely involve review of the drafting history of the pollution-exclusion clause. In *Morton Int'l, Inc. v. General Accident Ins. Co.*, 134 N.J. 1, 36, 629 A.2d 831, 851 (1993), the Supreme Court of New Jersey, in an exhaustive review, found that the insurance industry had knowingly misrepresented the pollution-exclusion clause's effect thereby maintaining its insurance premium while intending to substantially reduce coverage. *Morton*, 134 N.J. at 79–80, 629 A.2d at 876. The New Jersey high court held that as a matter of equity and fairness, the insurance industry should be bound by its representations or misrepresentations when the pollution-exclusion clause was presented to state regulators. *Morton*, 134 N.J. at 75–76, 629 A.2d at 874. Similarly, the high court of West Virginia found that the insurance industry had represented that the exclusion merely clarified the preexisting "occurrence" clause. *Joy Technologies*, 187 W.Va. 742, 421 S.E.2d 493 (1992). Recognizing that where a definite meaning had been ascribed to language used in an insurance policy, that meaning should be given to the language by the courts, the West Virginia court concluded that because the insurer had unambiguously and officially represented to the West Virginia Insurance Commission that the exclusion did not alter coverage under the policies involved, the policies issued by the insurer covered pollution damage, even if it resulted over a period of time and was gradual, so long as it was not expected or intended. *Joy Technologies*, 187 W.Va. at 748–749, 421 S.E.2d at 499–500.

In Oklahoma, insurance policy forms must be approved by the State Board for Property & Casualty Rates, and the Board may disapprove any policy that is ambiguous or misleading. *Minnehoma Ins. v. Oklahoma State Bd. for Property and Casualty Rates*, 562 P.2d 1152, 1154–1155 (Okla.1977). The summary judgment record contains information similar to that considered by the New Jersey and West Virginia courts.

8. The 1957 policy's insuring language provided that the insurer will "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury ... injury to or destruction of property, including the loss thereof, **caused by accident**. The coverage was extended by an "occurrence" endorsement whereby "occurrence" was deemed to an "accident" subject to the following:

1. "occurrence" shall mean **sudden or continuous or repeated exposure** to any condition resulting in such injury or destruction during the policy period, **except a condition** created, induced or **allowed to exist by the insured after it is evident that such injury or destruction may result** therefrom;

2. all such injury or destruction caused by continuous or repeated exposure to substantially the same condition shall be deemed to result from one occurrence and shall be subject to the **"each accident"** limit of property damage liability;

9. The 1965 policy provided that the insurer will "pay on behalf of the insured all sums which the Insured shall become legally obligated to pay as damages because of personal injury or property damage **caused by an occurrence** during the policy period. The definition of occurrence read:

5. *Occurrence.* Occurrence means an accident or injurious exposure to conditions which results, during the policy period, in personal injury or property damage **neither expected or intended** from the standpoint of the Insured.

3. The 1971 comprehensive general liability insurance policy issued by Continental National American Group remained occurrence-based, but "occurrence" was no longer an accident. "Occurrence" was defined as an event or injurious exposure and the word "accident" and the phrase "neither expected or intended" were deleted from the definition of "occurrence." [10] The pollution-exclusion clause was added as an endorsement, which on its face excluded damage "... arising out of the discharge, dispersal, release or escape of ... pollutants into or upon the land, the atmosphere or any watercourse ..." unless the "discharge, dispersal, release or escape is sudden and accidental."

Clearly, these policies were not drafted for understanding by the common person. The insurers urge that "sudden" means "abruptly or quickly," which words they could have used when they drafted the so-called standard exclusion. Because we must read the pollution-exclusion clause within the context of the entire policy and because the earlier policies utilized "accident" together with "neither expected or intended" in its definition of "occurrence," assigning the meaning of "unexpected and unintended" to the word "sudden," as Kerr–McGee urges, appears reasonable, if not the ordinary and popular meaning of "sudden."

### IV.

The majority opinion concludes that the ordinary and popular meaning of "sudden" necessarily includes an element of time and therefore "sudden" cannot describe gradual disposal of industrial waste that occurred over a number of years. The majority opinion does not further explain this element of time.

Several other state courts have concluded that "sudden" is unambiguous and that the ordinary and popular meaning of "sudden" includes a temporal aspect. But, our sister courts have not foreclosed coverage because "sudden" is unambiguous and has a temporal element as the majority does today. In *Hybud Equipment Corp. v. Sphere Drake Insurance Company, Ltd.*, 64 Ohio St.3d 657, 597 N.E.2d 1096 (1992),[11] a landfill case, the Ohio high court found that "sudden" is not synonymous with the word "unexpected" in the typical definition of "occurrence." The *Hybud* court held that "sudden" also has a temporal aspect and set forth three reasons therefore: 1) "sudden" most commonly means happening quickly, abruptly, or without notice; 2) in its ordinary use, the word "accidental" means "unexpected" as well as "unintended"; and, 3) if "sudden" means "unexpected," then the exclusion would exclude only damage that is already excluded by the definition of "occurrence." *Hybud* does not further explain the temporal element of "sudden"; however, as an aside, the Court announced that its interpretation is supported by public policy—encouraging diligence by placing the financial burden upon the entity best able to foresee and stop gradual or long-

10. The policy provided that the insurer will pay on behalf of the insured "all sums which the Insured shall become legally obligated to pay as damages, direct or consequential, ... caused by or arising out of an occurrence during the policy period." The definition of occurrence read:

9. *Occurrence.* Occurrence means an event or injurious exposure to conditions which results, during the policy period, in bodily injury and/or personal injury and/or employer's malpractice and/or property damage.

For the purpose of determining the limit of the Company's liability, all bodily injury, personal injury, employer's malpractice, and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

11. In *Hybud,* the parties liable for the environmental cleanup constructed the waste containers, collected and transported the waste, and owned and operated the landfill. They were an individual and two corporations. The individual, Hyman Budoff, was an officer and director in each corporation. One corporation, Industrial Excess Landfill, Inc., owned and operated the landfill. The other, Hybud Equipment Corporation, built and leased equipment, compactors and containers for solid waste and owned and operated the vehicles that collected and transported the waste materials. Three actions were filed against the two corporations and Budhoff for damages caused by landfill leakage of pollutants by a private individual, the federal government and the state of Ohio. The Ohio high court addressed the issue of whether the lability insurance carriers were under an obligation to defend because the claims were excluded from coverage by pollution-exclusion clauses.

term pollution. That is, *Hybud* turns on foreseeability or notice.

In *Lumbermens Mutual Casualty Company v. Belleville Industries, Inc.*, 407 Mass. 675, 555 N.E.2d 568 (1990),[12] the Massachusetts high court found "sudden" to be unambiguous and held that "sudden" has a temporal element when it is used in conjunction with "accidental" to describe a release of pollutants. The *Lumbermens* court said that the abruptness of the commencement of the release is the crucial element. Because of insufficient certified facts, the Massachusetts court refrained from further explanation of the temporal element of "sudden" and declined to speculate on the proper construction of the exception where a sudden and accidental release continues for an extended time, saying that at some point the release would cease to be sudden or accidental. That is, coverage or exclusion from coverage as decided in *Lumbermens* must turn on the facts in each case.

And, the Supreme Court of Minnesota, in *Board of Regents of the University of Minnesota v. Royal Insurance Company of America*, 517 N.W.2d 888 (Minn.1994), was asked to determine the application of the pollution-exclusion clause in an asbestos-pollution case. The Minnesota court found that "sudden" is not ambiguous and that "sudden" was used in the pollution exclusion clause to indicate the opposite of gradual. The Minnesota court was not compelled to further explain the meaning of "sudden," because the case turned on the meaning of "atmosphere." The Minnesota Court concluded that asbestos pollution inside the university buildings was not within the term "atmosphere" as used in the exclusion.

### V.

I do not find that "sudden" as used in the pollution-exclusion clause has a plain meaning. Were I to join with the majority in defining "sudden," I could not join in the majority's ruling that the pollution-exclusion clause bars coverage herein.

The trial court did not decide that the "release, dispersal or escape" of contaminants/pollutants at the Hardage site or any of the other eight sites and/or the resulting environmental impairment was "unexpected," and therefore within the insurance coverage. In granting summary judgment to Kerr–McGee as to the pollution-exclusion clause defense, the trial court said "that the clause is susceptible to at least two varying constructions" and the term "sudden will be found to mean unexpected, unintended or unforeseen." The trial court order allows the insurers to defend against Kerr–McGee's claims with proof that the release of pollutants was "unexpected."

Reversal of the trial court's definition of "sudden" does not support judgment in favor of the insurers on the issue of coverage. The pollution-exclusion clause deals with the release of pollutants upon and into the land, atmosphere, or waters. The pollution-exclusion clause does not deal with situations such as the licensed Hardage site, where the insured disposes of its waste by turning it over to a state licensed waste disposal system.

The question of whether the release of pollutants at the Hardage site or the other eight sites occurred within the meaning of the word "sudden" can only be decided upon the facts and circumstances of the release. Certainly, whether the release is within the temporal aspect of the word "sudden" is a question of fact. This Court has no evidence before it relating to the release of pollutants onto or into the land, atmosphere, or waters at the Hardage site. This Court's summary judgment in favor of the insurers that Kerr–McGee's legal obligations for cleanup at the Hardage site is premature.

12. In *Lumbermens,* the federal district court certified several questions to the Massachusetts high court. Three questions concerned the construction of a pollution-exclusion clause as involved herein: 1) is "sudden" in the pollution-exclusion clause unambiguous; 2) if so, does it have a temporal quality; and, 3) if so, what should be considered in determining the events that qualify as "sudden." The questions arose in an action by the United States alleging that Belleville Industries was liable for cleanup of the New Bedford Harbor. Belleville Industries had used PCBs in manufacturing electrical capacitators at its plant on the Acushnet River which flowed into New Bedford Harbor.