Fabricant, J.
Plaintiff Arrow Automotive Industries, Inc. (Arrow) brought this action against its insurers to compel them to defend and indemnify it in connection with an administrative order of the Massachusetts Department of Environmental Protection. Presently before the Court are Defendant Liberty Mutual Insurance Company’s (Liberty) Motion for Summary Judgment on all counts and Arrow’s Cross Motion for Partial Summary Judgment on Liberty’s duty to defend. For reasons discussed below, Liberty’s motion will be allowed in part and denied in part, and Arrow’s cross motion will be allowed.
BACKGROUND
1. Arrow’s Operations.
The materials submitted in connection with the present motions establish the following facts.[2] From 1968 until early 1981, Arrow operated an automobile parts remanufacturing facility in Hudson, Massachusetts. As part of its remanufacturing process, Arrow used solvents to remove grease and oil from used automobile parts. From 1968 until a date either in 1971 or in late 1973 or early 1974,[3] Arrow used only trichloroethylene (TCE) in its degreasing process. At that time Arrow replaced TCE with 1,1,1 trichloroethane (TCA), and thereafter it used only TCA, although according to Liberty’s expert “there is a reference to TCE possibly being present in the TCA formulation after that.” With the addition of a second degreaser in 1976, Arrow increased substantially the quantify of solvent it used. The degreasing process yielded solvent sludge, which was periodically cleaned out of the degreasers and placed in 55-gallon drums. The drums were stored in the area of a concrete pad[4] for up to a month until they were hauled away from the facility for disposal off-site.
Arrow experienced a labor strike at the Hudson facility in 1980. Supervisors continued operations for a few months into early 1981. At that time, Arrow closed the facility and ceased all operations there. Between April of 1981 and December 1981 or January 1982, Arrow disposed of all the equipment that had been located at the facility, including three degreasers, the solvent storage tank, and the solvent still. Each item was sold, scrapped, or moved to another Arrow facility. The piping that had run from outside the plant to the fresh solvent storage tank inside was removed and destroyed. The still was moved to an Arrow plant in California, but “a couple of years” later, according to deposition testimony of Arrow’s vice president, it was disposed of as scrap. Sometime thereafter, the site was leased to a printing company.
2. The DEP Notices and Arrow’s Response.
On February 18, 1982, the Massachusetts agency then known as the Department of Environmental Quality Engineering (“DEQE”), now known as the Department of Environmental Protection (“DEP”), sent a letter to Robert Warner, Arrow’s then director of finance.[5] The letter informed Arrow that the DEQE had “on February 11, 1982, in response to a complaint of December 31, 1981, conducted an inspection of your facility ... An initial inspection of storm drains upstream of the Kane Municipal well . . . was conducted on January 5, 1982 and analyzed . . . The inspection and laboratory analysis revealed the pres *227 ence of residues of 1,1,1 Trichloroethane ...” The complaint referred to originated with reports from the Hudson public works department of odors emanating from a catch basin near the site.[6] The DEQE letter informed Arrow that its finding “constitutes a violation” of specified regulatory and statutory provisions, and “invited” Arrow to attend a scheduled conference “to show cause why [DEQE] should not pursue appropriate legal measures against Arrow ... to stop violation of’ those provisions.
After receiving this letter, Arrow was advised by “counsel and others,” according to Holzwasser’s deposition testimony, that “you better get to work or the state will come down hard.” Under direction from DEQE, Arrow had the storm drain system cleaned and undertook a program of testing and monitoring of the area, including the Kane Municipal Well located near a wetland area where the storm drain system discharged. As part of this program, in 1984 Arrow hired an environmental consultant, Goldberg Zoino Associates (“GZA”), to conduct a site assessment. In June 1984, GZA reported to Arrow that it had found TCA in groundwater and unspecified volatile organic compounds (a category that includes both TCA and TCE) in septic tanks and elsewhere on the property.
Arrow provided GZA’s report to the DEQE. Based on that report, on July 19, 1985, DEQE issued to Arrow a Written Notice of Responsibility (“NOR”).[7] The NOR stated that DEQE “has obtained evidence that a hazardous material release has occurred” at the site, based on the GZA report, and that “[a]nalytical samples from groundwater and storm water catch basins at this site have identified detectable levels of volatile organic compounds,” including TCA and TCE.[8] The NOR informed Arrow that “[a]s the property owner, you have been determined to be the responsible party” under G.L.c. 2 IE, that under that statute Arrow was required to accept responsibility for assessment, remediation, and prevention, and that if Arrow failed to do so DEQE would undertake response actions and refer the matter to the Attorney General for civil and or criminal prosecution. The letter demanded a response from Arrow within five days of its receipt.
Arrow responded to the DEQE’s notice by engaging in further assessment and remediation efforts, through GZA and other consultants. One consultant report obtained by Arrow indicated that TCE and TCA were present in groundwater, “probably caused by direct subsurface migration from the source area near the concrete pad and downward leakage from the storm drain.” Another consultant came to a similar conclusion, opining that the contamination resulted from one or more surficial release(s) in the area of the concrete pad.
3. Arrow’s Investigation.
Beginning in about 1987, and continuing through the discovery period, Robert Holzwasser, Arrow’s vice president, undertook a process of interviewing present and former employees in an effort to determine how the contamination had occurred. According to Holzwasser’s deposition testimony, he “couldn’t find everyone I wanted to.” Four former employees whom Holzwasser would have interviewed, Stan Ditt, Jim Burge, Frank Maitland, and James McKay, had died by the time he looked for them.[9] Ditt was manager of manufacturing, with responsibility for all aspects of production. Maitland shared responsibility with John Porazzo for supervising maintenance; Holzwasser would have inquired of him as to the existence of maintenance records regarding any incidents of releases.
Holzwasser’s efforts located two former employees who remembered an incident involving solvent leaking from barrels, Thomas Coye and David Lassiter. Coye had worked as a materials control supervisor at the Arrow plant. In “around 1974, 1975" according to his deposition testimony, he saw holes in drums of degreaser sludge located in the area of the concrete pad. He saw holes in more than one drum, but he does not remember how many drums. As he described the holes, they were ’’little round holes, size of a quarter, dime." He did not “see any liquid leaking from” the holes, but observed “the odor the degreaser gives off, and... a lot of discoloration on the ground ... flowing out . . . towards the driveway.” Coye told Stan Ditt, then manager of manufacturing, John Porazzo, then engineering manager, and David Lassiter, an assember, of his observations at the time.
David Lassiter, who worked as an assembler at Arrow from 1970 to 1981, testified at his deposition that “sometime in the ‘70s” Tom Coye told him that “there were drums outside leaking fluid ... He said they looked like pinholes." Lassiter “went out and took a look,” and saw “one or two” drums leaking. The leaking drums were on the concrete pad. The holes looked like “a pinhole.” The leak “was like shooting over... when there is a lot of pressure and just a little pinhole, that’s what it looked like.” He saw “some” fluid on the concrete. Asked to estimate the quantity of fluid, Lassiter testified that it was “not a lot. . . could be about half a gallon. Maybe a gallon.” Lassiter put down some “Speedi-Dry” to absorb the fluid. Thereafter, Jim McKay, head of maintenance, came out to investigate, and Lassiter resumed to his other responsibilities.[10] The next time Lassiter observed the area, those drums had been removed.
There is no evidence that the incident described by Coye and Lassiter ever came to the attention of Arrow’s president, treasurer, or other management personnel at a level higher than Stan Ditt. Coye’s report to Ditt was in accord with Arrow’s practices at the time, under which such events were handled at the level of the engineering department, and not reported to higher levels.
4. Insurance Coverage, Notice to Liberty, and Liberty’s Response.
*228 During each of the years it operated the Hudson plant, Arrow carried primary and excess Comprehensive General Liability (CGL) insurance policies issued by Liberty. The CGL policies provided that Liberty would indemnify Arrow for any sums that Arrow “shall become legally obligated to pay” as a result of “property damage,” subject to certain definitions and exclusions, and would defend Arrow against any “suit. . . on account of such . . . property damage.” For policy years through 1970, the policies contained no exclusion for property damage resulting from pollution. For policy years 1971 and after, the policies contained an exclusion, barring coverage for claims of damage from the release of pollutants unless the release was “sudden and accidental.”[11]
The CGL policies required that Arrow provide written notice to Liberty “in the event of an occurrence,” as defined in the policies. Liberty’s standard policy requires notice “as soon as practicable.” Beginning in 1974, however, Arrow negotiated an endorsement providing that “the usual provisions for time to report a loss is amended to be when the occurrence has been reported to the President or Treasurer of Arrow.” For 1976 and subsequent years, the notice provision was again amended, this time requiring notice “as soon as practicable after the insured’s President or Treasurer or other person designated by the insured for that purpose has actual knowledge of the occurrence."
Arrow first notified Liberty of the matter by letter from its then counsel dated February 17, 1988. The letter referred to “a claim” brought by the DEQE “relating to releases of hazardous waste at, beneath and adjacent to” Arrow’s property, in the form of the July 1985 NOR, a copy of which it enclosed. It stated that “[s]ince the issuance of the Notice of Responsibility, Arrow has undertaken certain site assessment work and is now planning to undertake a remediation program.” The letter made no mention of the DEQE’s 1982 notice, or of any other events prior to the NOR. It requested that Liberty “defend and indemnify . . . Arrow from all liability associated with this claim,” under policies issued for 1975 and subsequent years. The letter went on to indicate that “unless I hear otherwise from you within seven days” Arrow would “continue to take all reasonable measures necessary to protect [its] interests and prevent further environmental harm . . . while you are investigating this claim.”
Liberty responded by requesting information, including copies of technical reports, from Arrow’s counsel. After review of the information thus obtained, by letter dated March 29, 1989, Liberty denied coverage on three grounds.[12] First, Liberty asserted that an “occurrence” as defined in the policy had not taken place, since the contamination was “neither expected nor intended from the standpoint of the insured,” but was an expected result of Arrow’s “practice of discharging waste water into the septic system.” Second, Liberty contended that the pollution exclusion barred coverage, since the contamination was not “sudden and accidental.” Third, Liberty maintained that response costs are not damages under the CGL policies. Liberty also asserted that Arrow’s failure to provide timely notice, despite knowledge of contamination since January of 1982, “has severely prejudiced our rights under the policy.”
On May 28, 1991, Arrow’s present counsel wrote to Liberty, informing it that DEP had declared the site a “priority” site presenting an “imminent hazard,” and had ordered implementation of a “Short Term Measure.” Counsel also advised Liberty of the Supreme Judicial Court’s decisions in Hazen Paper Co. v. United States Fidelity & Guar., 407 Mass. 689 (1990), holding that an administrative enforcement order is a damages claim for purposes of liability insurance, and in Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc., 407 Mass. 675 (1990), applying in an environmental context the standard for the duty to defend articulated by the Appeals Court in Sterilite Corp. v. Continental Cas. Co., 17 Mass.App.Ct. 316 (1983). Based on these new facts and decisions, counsel asserted that Liberty was obligated to defend and indemnify, and that its failure to do so constituted a violation of G.L.c. 93A.
There followed a series of letters and conversations between Arrow’s counsel and Liberty’s claims adjuster. In one such letter, dated June 17,1992, Arrow’s counsel for the first time informed Liberty of the information Arrow had obtained from Coye and Lassiter. Counsel asserted that the incident they described “is the only identifiable incident which reasonably explains the hot spot of contamination near the loading docks,” and that this evidence established that the contamination resulted from a release that was sudden and accidental. In response to this information, on May 25, 1993, Liberty’s adjuster conducted a telephone interview with Coye, who at that time described the holes in the drums as appearing to have been made by “someone purposely punching them.” Liberty then notified Arrow, by letter dated July 19, 1993, of its “decision to maintain our coverage position as outlined in our March 29, 1989 letter.”
5. The Litigation.
Arrow filed this action on February 15, 1994, asserting breach of contract and violation of G.L.c. 93A and c. 176D. Arrow sought a declaration that Liberty is obligated to defend and indemnify it against the DEP’s claims,[13] along with treble damages and attorneys fees.
As the litigation proceeded, each side obtained, and provided in discovery, expert opinions as to the cause of the contamination. Arrow’s experts express the view that the contamination resulted from multiple releases “over the period of time when the drums were there,” and that the releases were caused by a phenomenon they call “accelerated corrosion,” in which hydrochloric acid in a steel drum causes pitting, lead *229 ing to penetration and leakage. According to chemist Robert B. Pojasek, this process can produce penetration in “probably less than 48 hours from initiation of the pitting. However, no one knows how long it takes to initiate.”[14] Once penetration has occurred, the release “could happen instantaneously upon jarring.”
James Bushman, also an expert for Arrow and a specialist in corrosion, opined at his deposition that the “entire process . . . could be expected to happen, including the time to getting the coating [of the steel drum] to burst, in less than 30 days time . . . somewhere between six and thirty days.” Bushman added that the process occurs regardless of whether any occlusion, dirt, or fleck exists in the steel. Asked whether “[i]t is just going to happen every time,” he responded “]t]hat is just the way God made it. Do you understand that all steels want to corrode? It is all a question of time.”
Thomas Woodard, also an expert for Arrow, performed groundwater modeling in an effort to identify the date of the release or releases. Based on “the configuration of the groundwater contamination plume as it was discovered by GZA in ‘84 or ‘85,” he concluded that the release or releases had occurred eight or nine years earlier, that is, in “the mid-1970s.” Asked whether it could have been earlier, he answered “probably not . . . [t]he plume . . . tells us . . . with some confidence the early end of things." In his opinion the total amount released was between fifty and two hundred and fifty gallons.
Liberty’s expert, Thomas E. Roy, generally agrees that “hydrochloric acid would contribute to drum corrosion,” but estimates that the process would take “weeks to months.” He also agrees that the amount of contamination present at the site could not have resulted from the “half gallon to a gallon” leakage described by David Lassiter, and that “there would have to be more releases.” He opines that the total was approximately one thousand gallons. He expresses no opinion as to the date of the releases.[15]
DISCUSSION
This Court grants summary judgment where there are no genuine issues of material fact and the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with evidence establishing the existence of a genuine issue of material fact. Pederson, 404 Mass. at 17. The nonmoving party cannot defeat the motion for summary judgment by resting on his or her pleadings and mere assertions of disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
I. The Dufy to Defend.
A. The Standard.
The basic rule regarding an insurer’s duty to defend under a contract of liability insurance is set forth in Sterilite Corporation, 17 Mass.App.Ct. at 318. The Appeals Court said there:
. . . [T]he question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are “reasonably susceptible” of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense . . . [T]he process is one of envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.
(Citations omitted.) The Supreme Judicial Court adopted this standard, citing Sterilite with approval, in Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 146-47 (1984), and has applied it in the environmental context. E.g. SCA Serv., Inc. v. Transportation Ins. Co., 419 Mass. 528, 531-32 (1995); Liberty Mut. Insur. Co. v. SCA Serv., Inc., 412 Mass. 330, 331-32 (1992); Lumbermens, 407 Mass. at 684-85; see also HDH Corp. v. Atlantic Charter Ins. Co., 425 Mass. 433, 436 (1997).
Thus, the duty to defend depends not on the actual facts of the event giving rise to the claimed liability, but on the full range of possible facts that could fall within the scope of the third party’s complaint.[16] Where a complaint is so general as to encompass a wide range of possible scenarios, the “possibility that the liability falls within the insurance coverage” is enough to trigger the duty to defend. Sterilite, 17 Mass.App.Ct. at 319. Only where “the allegations of the complaint describe with precision" events which “the insurance policy expressly excludes from coverage” is the insurer free to refuse a defense. Terrio v. McDonough, 16 Mass.App.Ct. 163, 168 (1983). See HDH Corp., 425 Mass. at 437 (no duty to defend where “complaint did not state a claim that could result in liability [the insurer] would be obligated to pay under any reasonable interpretation oF the policy); Liberty *230 Mutual v. SCA Serv, Inc., 412 Mass. at 338-39 (no duty to defend where complaint alleged dates and described manner of releases so as to show not sudden and accidental).
Even if the complaint does not appear to fall within the policy, the insurer may have a duty to defend if additional facts, known or available to it, indicate that the claim is covered. E.g., Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7, 10-11 (1989) (insurer required to defend under defamation liability policy where complaint on its face alleged only breach of contract, but additional facts known to insurer indicated plaintiff alleged harm to reputation). The converse, however, is not the case; where a complaint on its face is susceptible of a reading that brings the claim within the policy, the insurer cannot rely on facts outside the complaint to justify a unilateral refusal to defend. Sterilite, 17 Mass.App.Ct. at 323. Its remedy in such a situation is to bring an action for declaratoiy judgment, in which it can seek to establish that the actual facts of the underlying claim preclude coverage. Id. In such an action, the insurer generally must name the third-party claimant as well as the insured, so that the third-party claimant will be bound by the adjudication, and the insured will be protected from the possibility of inconsistent adjudications. Id. Pending the outcome of that action, the insurer must defend the underlying claim. Id.
Here, Liberty declined to defend without bringing any action to establish the absence of a duty. It was Arrow that brought this action, seeking to compel Liberty to defend. Moreover, the DEP is not a party to this case and will not be bound by any declaration entered here regarding the nature of the claim or the underlying facts. In this context, the principles discussed supra dictate that Liberty’s duty be considered based on the DEP’s notice, read broadly. To the extent that additional information is known or available, that information may serve to broaden interpretation of the DEP’s claim, so as to bring it within the scope of coverage under the policies even if it would not otherwise be; it may not, however, provide a basis for reading the claim more narrowly than the notice would otherwise support, so as to exclude coverage.[17]
B. The DEP’s Claim.
The DEP’s 1985 NOR, in the manner of such administrative notices, provided relatively little information as to the nature of DEP’s allegations. The notice informed Arrow only “that a hazardous material release has occurred,” that the material consisted of TCA, TCE, and other volatile organic compounds, and that the resulting contamination affected “groundwater and storm water catch basins.” The notice referred to, and implicitly incorporated, the June 1984 GZA report, which provided additional information about the contamination.[18] Not surprisingly, in light of DEP’s statutory role, it took no position on when or how the contamination occurred. See generally, Highlands Insur. Co. v. Aerovox Inc., 424 Mass. 226, 243 (1997). Thus, on its face the DEP’s claim is susceptible of interpretation as alleging contamination resulting from one or more releases that occurred in any manner, at any time during Arrow’s operations. In addition, Liberty is chargeable with knowledge that Arrow conducted operations at the site from 1968 through 1981, and that it used TCE from 1968 through at least 1971, and TCA thereafter, so that the releases alleged could have involved those materials during those time periods. These facts in no way preclude the possibility that the releases were “sudden and accidental,” or that an appreciable portion[19] of them occurred prior to 1971, when that requirement first appeared in the policies. Accordingly, they establish a duty to defend under the policies.
C. Late Notice.
Liberty contends that it is absolved of all obligations under the policies, including the duty to defend, because Arrow failed to meet the policies’ conditions of timely notice. Such a failure prior to October of 1977 would permit Liberty to deny coverage, regardless of any prejudice. See Johnson Controls, Inc. v. Bowes, 381 Mass. 278, 280 (1980). A failure of notice after that date, however, permits an insurer to deny coverage only if it can show that it “has been prejudiced thereby.” G.L.c. 175, §112, as amended by St. 1977, c. 437; Darcy v. Hartford Insur. Co., 407 Mass. 481, 486 (1990).
Thus, it is necessary to determine when Arrow’s duty to notify Liberty arose. Liberty contends that the relevant date is when Thomas Coye and David Lassiter saw leakage from drums in the mid-1970s. Under the policies, the duty to notify arose no sooner than the happening of an “occurrence,” defined as “an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.” “Property damage,” for purposes of this definition, does not include damage to “property owned or occupied by or rented to the insured.” In light of the information now available, it appears likely, if not certain, that the incident described by Coye and Lassiter, in combination with other incidents not observed by any identified witnesses, did eventually cause damage to the groundwater and the municipal well. But nothing in the record indicates that Arrow had any reason at the time to know that any such damage had or would occur, or would be alleged to have occurred. Cf. Fireman’s Fund Insur. Co. v. Valley Manufactured Prods. Co., 765 F.Sup. 1121, 1127 (D.Mass. 1991) (“magnitude" of 500-gallon leak of TCE put policy-holder on notice of “likely consequential property damage”). Arrbw could not have a duty to tell Liberty what it did not know and had no reason to know.[20]
In February of 1982, however, upon its receipt of the DEQE’s first letter, Arrow clearly did know, at the *231 level of its president, that it was accused of violation of statutory and regulatory provisions governing disposal of hazardous waste, and that such violation was alleged to have caused contamination affecting public storm drains and posing a threat to a municipal well. At that point, there can be no doubt that Arrow had a duty to notify its insurer.
Arrow points out that the 1982 DEQE notice did not claim damages, and that G.L.c. 21 C, under which DEQE acted at that time, did not authorize it to recover damages. It asserts further that between 1982 and the 1985 NOR “it had completely resolved the issues raised in the 1982 letter, and had no reason to suspect that it had the contamination problem which is the subject matter of this controversy.” The notice requirement, however, is triggered not only by the assertion of a claim for damages, but by the insured’s knowledge of an occurrence, or of an allegation of an occurrence. E.g. Hoppy’s Oil Serv., Inc. v. Insurance Co. of North Am., 783 F.Sup. 1505, 1510 (D.Mass. 1992); Fireman’s Fund, 765 F.Sup. at 1127; Granite State Minerals v. American Insur. Co., 435 F.Sup. 159, 164-65 (D.Mass. 1977). The 1982 letter unequivocally informed Arrow of DEQE’s determination of the happening, or alleged happening, of one or more events within the definition of “occurrence.”
Despite its clear duty under the policies, Arrow waited six years to notify Liberty. Obviously, six years is well past “as soon as practicable.” Arrow offers no explanation or excuse for the delay,[21] resting entirely on Liberty’s burden to show prejudice.
In light of the passage of six years, and the extensive investigation (both factual and technical) and remediation that occurred during that time, without Liberty having any opportunity to participate, it certainly seems likely that Liberty was prejudiced. But the Supreme Judicial Court has made it unequivocally clear that likelihood of prejudice is not enough, and that prejudice will not be presumed, even in cases of “extreme” delay. Rather, “the delay in notice must be accompanied by a showing of some other facts or circumstances such as, for example, the loss of critical evidence, or testimony from material witnesses despite diligent good faith efforts on the part of the insurer to locate them, which demonstrates that the insurer’s interests have been actually harmed.” Darcy, 407 Mass. at 486; see also Employers’ Liab. Assurance Corp. v. Hoechst Celanese Corp., 43 Mass.App.Ct. 465, 476 (1997); cf. West Bay Exploration Co. v. AIG Specialty Agencies of Texas, Inc., 915 F.2d 1030, 1037 (6th Cir. 1990) (applying presumption of prejudice based on length of delay under Michigan law).
In attempting to meet this burden, Liberty points to Arrow’s closing and dismantling of its Hudson plant, along with the deaths of the four employees who Holzwasser testified he would have interviewed, had they been available. The plant closing, and the disposal of its equipment, obviously impaired Liberty’s, as well as Arrow’s, ability to investigate possible causes or mechanisms of release. But the plant was closed in 1981, and the evidence indicates that, with one possible exception, all the equipment had been disposed of by January of 1982. Cf. Hoppy’s, 783 F.Sup. at 1510 (destruction of leaking tank after insured learned of occurrence, but before it notified insurer, showed prejudice). Whatever investigatory possibilities an intact plant would have offered were thus gone before Arrow’s duty of notice arose; its delay after that time did not affect those possibilities.
The one possible exception is the still, which Holzwasser testified was in use in an Arrow plant in California until “a couple of years” after the plant closing. Had Arrow notified Liberty promptly after receiving the 1982 DEQE letter, and had Liberty responded by promptly and thoroughly investigating, it might have learned of the availability of the still, and might then have conducted some unidentified type of testing, presumably to determine whether defects in the still might offer an alternative explanation of some or all of the contamination. This series of theoretical possibilities is simply too speculative to meet Liberty’s heavy burden under Darcy, 407 Mass. at 486-87. The likelihood that Liberty would have conducted that level of factual investigation seems particularly low, given the response Liberty actually made when Arrow finally did notify it. Even assuming it would have done so, however, Liberty has failed to offer any evidence as to what testing could be done on a still, or how any results that might be obtained would have improved its present position.
The effect of the deaths of the four former employees is similarly speculative. Liberty never did undertake a search for potential witnesses, and apparently learned of these four only in discovery in this case. Moreover, from the evidence offered, there is no indication that any of the four other than possibly James McKay was in a position to observe directly any events of relevance, or that McKay would have added anything to the testimony of Coye and Lassiter that would have been of assistance to Liberty.[22] Moreover, Liberty has not offered evidence of when McKay died, although that would seem to be a fact susceptible of determination. Ditt and Maitland are identified only as possible sources of information as to what records might have existed; there is no evidence that either of them ever took any documents from Arrow’s premises, or that any relevant documents, not now available to Liberty, remained in existence after the plant closing. Liberty identifies Jim Burge only as “an engineering plant manager with knowledge of Arrow’s operations and its use of solvents." It offers no more specific indication that Burge would have had any particular relevant information. Under the circumstances, Liberty has failed to make the specific showing, required under Darcy, that Arrow’s delay in giving it notice has placed it “in a substantially less favorable position than it *232 would have been had it received earlier notice.” 407 Mass. at 487; cf. Fireman’s Fund, 765 F.Sup. at 1128 (finding prejudice where “upon investigation of the tank leak, the insurers learned that a[n] employee, who had observed... the events surrounding the tank leak as they took place, had died” before the insured notified the insurer of the leak). Thus, Arrow’s late notice does not absolve Liberty of the duty to defend, and summary judgment must be entered in favor of Arrow on so much of the complaint as seeks to establish that duty.[23]
II. The Duty to Indemnify.
Liberty’s duty to defend Arrow against the DEP’s claim does not determine whether it must indemnify Arrow for the cost of remediation. The duty to indemnify is narrower than the duty to defend, since it depends on whether the actual facts of the events in issue fall under the coverage of the policies. Liberty Mutual Ins. Co. v. SCA Serv., Inc., 412 Mass. at 332. Here, that question turns on whether the contamination resulted from releases constituting occurrences under the policies, and not excluded by the pollution exclusion provisions — that is, whether the contamination resulted from releases that occurred and damaged property other than Arrow’s in the years prior to 1971, before the pollution exclusion provisions, and/or from later releases that were “sudden and accidental.” The facts lead to different conclusions for the different materials involved in the contamination.
A. The TCA Contamination.
It is undisputed that Arrow began using TCA in 1971 at the earliest, so no releases of TCA could have occurred at Arrow’s plant before 1971. Arrow’s own expert dates the releases in the “mid-’70s.” Thus, the evidence presents no possibility that Arrow could carry its burden of proving coverage under the prepollution exclusion policies in effect before 1971; to obtain indemnification for the cost of remedying TCA contamination, Arrow must prove that the release or releases causing that contamination were “sudden and accidental,” so as to fall within the exception to the pollution exclusion. See Highlands, 424 Mass. at 234 (insured has burden of proof of “sudden and accidental”).
Suddenness, for purposes of the exception, has a “temporal element.” Lumbermens, 407 Mass. at 680. The determinative question, as the Supreme Judicial Court has phrased it, is whether the release was “abrupt” or “gradual.” Id. The mechanism of the release bears on this question. As the SJC stated in Goodman v. Aetna Cos. & Sun Co., 412 Mass. 807, 811 (1992),
While the cause of the release does not determine whether the exception to the pollution exclusion is applicable, it may well be informative in deciding whether the release was abrupt. For example, a sudden cause (like a pile driven into a gasoline tank),[24] or the sudden development of a condition (like a ground shift that ruptures piping) might guide the decision whether a given release of pollutants was due to a momentary event, and therefore, was abrupt.
Arrow attempts to meet its burden by showing that the releases resulted from “accelerated corrosion." Corrosion, by its very nature, is gradual in the sense that it develops over a period of time. Penetration of liquid through a breach caused by corrosion is thus due not to a “momentary event,” in the language of Goodman, but to a gradual process. See, e.g), EDO Corp. v. Newark Ins. Co., 878 F.Sup. 366, 376 (D.Conn. 1995) (“leak caused by corrosion” not “sudden”); American Ins. Co. v. Fairchild Indus., Inc., 852 F.Sup. 1173, 1182 (E.D.N.Y. 1994) (tank failure caused by corrosion or thermal fluctuations is not “sudden”); ACL Technologies, Inc. v. Northbrook Property & Cas. Ins. Co., 22 Cal.2d 206, 219 (Cal.App. 4 Dist. 1993) (“corrosion is, by definition, a gradual process”); Gridley Assoc. v. Transamerica Ins. Co., 828 P.2d 524, 527 (Utah App. 1992) (“clean break” was sudden, as opposed to corrosion which is not sudden).
That the particular type of corrosion involved here was “accelerated,” as Arrow contends, does not make it “abrupt.” Arrow’s own evidence is that the process took “probably less than 48 hours from initiation of the pitting,” and that the “entire process . . . could be expected to happen (in) . . . somewhere between six and thirty days.” Such timing is hardly “momentary.” See Service Control Corp. v. Liberty Mut. Ins. Co., 54 Cal.Rpt.2d 74, 81 (Cal.App. 4 Dist. 1996) (“corrosion by any name, accelerated or not, is still corrosion”).[25]
It is relevant also that, as so graphically explained by Arrow’s expert,[26] corrosion is a function of the inherent nature of the materials involved. Its occurrence and results were thus not an aberration, but a predictable part of the ordinary operations of the plant, even if not known to or subjectively expected by its personnel. See Polaroid v. Travelers Indem. Co., 414 Mass. 747, 752 (1993) (“sudden and accidental" not assessed from insured’s perspective). Indeed, it is the unanimous opinion of both sides’ experts that the contamination at the site resulted not from any single incident, or even a small number of incidents, but from numerous releases over the entire time that drums were stored in the area of the concrete pad. See Liberty Mutual Ins. Co. v. SCA Serv., Inc., 412 Mass. at 336 (releases from repeated crushing of barrels not sudden and accidental, although each commenced abruptly); see also Nashua Corp. v. First State Ins. Co., 420 Mass. 196, 201-02 (1995); Lumbermens Mutual v. Belleville Industries, 938 F.2d 1423, 1427-28 (1st Cir. 1991) (sudden and accidental exception intended to cover occurrence that “would be a marked departure from normal operations,” not incidents that are “on the fringe of normal operations”).
Arrow argues that the focus should be on the time when the pollutant begins to penetrate the hole in the drum. It points to Lassiter’s description of the fluid *233 “shooting out,” and to expert testimony that pressure inside a drum could cause leakage to begin with a “burst” or “spurt.”[27] As the Supreme Court, Appellate Division of New York has observed, “every dispersal of pollution begins with the abrupt entry of molecules of the offending substance into the surrounding environment.” Northville Indus. v. National Union Fire Insur. Co., 636 N.Y.S.2d 359, 366 (2 Dept. 1995), aff'd, 89 N.Y.2d 621 (1997). If that were enough, “the suddenness requirement would be rendered meaningless.” IcL; see also Ray Indus, Inc. v. Liberty Mut. Ins. Co., 974 F.2d 754, 768 (6th Cir. 1992) (“one can always isolate a specific moment at which pollution actually enters the environment”); American Ins. Co., 852 F.Sup. at 1182 n.18.
Arrow’s evidence, considered in the light most favorable to it and with all inferences drawn in Arrow’s favor, simply does not show that it can meet its burden of proving that the TCA contamination resulted from any sudden and accidental events, within the meaning of the exception to the pollution exclusion. Accordingly Liberty is entitled to summary judgment on so much of the complaint as seeks to establish a duty to indemnify Arrow for remediation of TCA contamination.
B. The TCE Contamination.
The facts regarding TCE leave more room for dispute. It is clear that Arrow did use TCE during time periods covered by prepollution exclusion policies. Holzwasser’s testimony would support a finding that it used TCE only during those periods, and not later. A trier of fact could credit that testimony, rather than Porazzo’s later date, and could infer from it that the TCE contamination had to result from releases before the pollution exclusion, despite Woodard’s opinion that the releases were in the “mid-1970s.” On the other hand, the fact finder might reject Holzwasser’s date, viewing Porazzo’s date of late 1973 or early 1974 as consistent with Woodard’s “mid-1970s” estimate, and find that all the contamination, both TCE and TCA, resulted from releases that occurred at times when the pollution exclusion was in effect.[28] Thus, a genuine dispute exists as to when the TCE releases occurred, and that dispute is material to the issue of the duty to indemnify for contamination caused by those releases.
As Liberty points out, even preexclusion releases would not be covered unless they caused damage, to property other than Arrow’s, before the exclusion took effect. Neither party has pointed to any evidence on the timing of the contamination, as opposed to the releases. The burden to prove coverage is on Arrow, but its obligation to present evidence in opposition to summary judgment arises only upon Liberty’s presenting evidence showing that Arrow is unlikely to meet this burden. Liberty has not done so. Summary judgment must therefore be denied on that issue.[29]
III. The 93A Claim.
In Counts III and IV of its complaint, Arrow asserts claims for unfair and deceptive acts or practices under G.L.c. 93A, §§2, 11, based on unfair claim settlement practices in violation of G.L.c. 176D, §3(9). “An insurance company which in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy cannot ordinarily be said to have committed a violation of G.L.c. 93A.” Lumbermens Mut. Cos. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 468 (1995); see also Polaroid, 414 Mass. at 754; Boston Symphony, 406 Mass. at 14-15.
The evidence presented in the present record establishes beyond genuine dispute that Liberty’s denial of coverage was based on a plausible interpretation of the policies and of the DEP’s claim, in light of the available case law. As to the duty to indemnify, Liberty’s position was not only plausible but correct with respect to the TCA contamination, and may yet turn out be correct as to all of the contamination. As to the duty to defend, this Court has concluded, with the benefit of decisions issued in the last several years, that the denial was wrong. But that does not make it so unsupportable as to be a c. 93A violation. At the time of Liberty’s initial determination, prior to Hazen, no Massachusetts appellate decision had recognized a liability insurer’s duty to defend against an administrative order. Even after Hazen there was considerable room for doubt as to how the Sterilite standard would be applied to such claims. A series of SJC decisions over the last several years, cited in part I, supra, has been necessary to provide guidance on that question. Perhaps most important, Liberty was well aware of Arrow’s extreme and unexplained delay in giving it notice, and had plausible, albeit ultimately insufficient, grounds to claim prejudice. Under these circumstances, its refusal to defend, although a breach of its contractual duty, was not “unfair and deceptive” so as to violate c. 93A.
ORDER
For the foregoing reason, it is hereby ORDERED that Defendant Liberty Mutual Insurance Company’s Motion for Summary Judgment is ALLOWED with respect to so much of Counts I and II of the complaint as seek to establish Liberty’s duty to indemnify Arrow for remediation of TCA contamination, and breach of contract based on that duty, and with respect to Counts III and IV of the complaint, and in all other respects DENIED. Plaintiff Arrow Automotive Industries, Inc.’s Cross Motion for Partial Summary Judgment is ALLOWED with respect to so much of Counts I and II of the complaint as seek to establish Liberty’s duty to defend Arrow against the DEQE’s 1985 NOR, and liability for breach of that duty under Count II.

 The evidence offered by both sides with respect to Arrow’s operations consists generally of the available witnesses’ less than precise recollections of events in the distant past, unsupported by documentary records. Although the witnesses’ versions leave a number of questions as to what actually occurred unanswered, or answered only vaguely, except in the area discussed in part II B below, they do not conflict so as to create credibility contests on material points. Thus, *234 although it seems an exaggeration to say that the summary judgment record “establishes” the material facts, there is no indication that the evidence that would be presented at a trial would include anything more definitive, except on that one issue. The facts recited are those that a trier of fact would be warranted in finding based on testimony in accord with the affidavits, depositions, and other materials presented in the present record, considered, with respect to each motion, in the light most favorable to the party opposing the motion.

 Robert Holzwasser, Arrow’s vice president, remembers this date as 1971. John Porazzo, Arrow’s former engineering manager, remembers it as late 1973 or early 1974.

 The concrete pad was installed in the mid 1970s, but the same area was used for storage of the drums prior to the installation of the pad.

 Arrow’s vice president, Robert Holzwasser, testified at his deposition that Harry Holzwasser, then president of Arrow, was made aware of the DEQE letter.

 Although the sequence of events suggests the possibility that the Town’s and DEQE’s investigation began while Arrow was still in the process of dismantling its plant, the record provides no evidence that Arrow knew of any investigation prior to its receipt of DEQE’s February 18, 1982, notice.

 According to Holzwasser, the NOR “was an anticipated event,” based on Arrow’s communications with DEQE between 1982 and 1985.

 The other substances listed in the NOR as having being found at the site are identified in expert testimony as “ ‘breakdown’ products, i.e. chemical compounds which result from the degradation of TCE and TCA.”

 Holzwasser testified that Ditt and Burge had died “about ‘85,” and Maitland had died “[plrobably about ‘90, ‘89.” The record does not indicate when McKay died.

 Arrow suggests, based on the inconsistency between Coye’s and Lassiter’s testimony, that the two witnesses refer to separate incidents. Whether the testimony describes one incident or two, the parties’ experts appear to agree that the quantity of contamination indicates that a single incident of this type could not have been the sole cause of the entire problem.

 Neither party has been able to produce the declaration sheet for the primary policy for 1971, but the declaration sheet for that year’s excess policy has been produced, and contains the exclusion. Liberty has submitted Em affidavit of its Director of General Liability in its Business Markets Underwriting Department, stating that it began adding the pollution exclusion to its CGL policies “routinely” as of January 1, 1971, and that “[i]t is standard underwriting practice that an excess policy tracks exactly the coverage that is provided in the primary policy below it.” Arrow has offered nothing to controvert this evidence, which is sufficient to prove the existence of the exclusion in the 1971 policy.

 Liberty identified the relevant policy as the one issued for 1982-83.

 The complaint alleges that DEP “has notified Arrow of its potential liability,” and seeks a declaration with respect to “the DEP’s claims.” It makes no specific reference to any one or more of the various DEP orders.

 Arrow contends, citing Pojasek’s deposition testimony, that “accelerated corrosion" was unknown until the mid-80s. The testimony cited, however seems more reasonably interpreted as indicating that what was newly understood in the mid-80s was not the phenomenon itself, but the advisability of adding a caustic material, such as limestone or baking soda, to neutralize the solvent and inhibit the formation of hydrochloric acid.

 The discovery process also elicited deposition testimony that “occasional” dripping and small spills of solvents on the plant floor occurred as parts were removed from the degreasers in the course of Arrow’s operations.

 For this purpose, the DEP’s 1985 NOR is the functional equivalent of a complaint. Hazen, 407 Mass. at 695-97.

 In this respect, for purposes of the standard summary judgment analysis, the only facts that are material to the issue of the duty to defend are the policy provisions, the DEP’s 1985 notice, any additional facts that might bring the DEP’s claim within the coverage of the policies, and facts relating to the issue of late notice; disputes as to the actual facts of the events giving rise to the DEP’s claim are not material, and do not preclude summary judgment.

 Neither party has provided the Court with a complete copy of this report. Liberty has not argued that anything contained in it, by incorporation into the DEP notice, limits the scope of the DEP’s claim in any respect material to the issue of coverage under the policies.

 See Highlands, 424 Mass. at 235 (“an appreciable and compensable portion of the damage" must be attributable to an occurrence within the coverage of the policy).

 For this reason, there is no need to address the effect of the amendatory endorsements to the notice requirement, or of Arrow’s internal reporting systems.

 Perhaps the explanation is that Arrow’s early evaluation of the applicability of the policies led it to the same conclusions that Liberty reached in 1989.

 Liberty suggests that McKay could have provided information regarding how quickly the leak observed by Lassiter was stopped. Since Lassiter did not claim to have seen its beginning, and since it seems clear that that incident was only one of many, it is unlikely that McKay’s answer on that point would have been determinative of any material issue.

 It does not necessarily follow that Liberty must reimburse Arrow for expenditures on defense efforts between 1982 and the time of its notice in early 1988. Liberty was entitled under the policies to control the defense, and to decide for itself the most cost-effective way to defend. Arrow’s six-year delay in notifying Liberty effectively usurped that right during that period. The effect of that conduct on Arrow’s claim for damages arising from breach of the duty to defend remains open, to be addressed in further proceedings with respect to damages.

 Arrow’s expert replied in the negative when asked at his deposition whether accelerated corrosion was as sudden as “a pile driven into a gasoline tank."

 In denying review, the Supreme Court of CEilifornia ordered the decision of the intermediate appellate court withdrawn from publication. 54 Cal.Rptr.2d at 74 n. 1. This Court nevertheless finds it persuasive.

 "That is just the way God made it. Do you understand that all steels want to corrode? It is all a question of time.”

 None of this testimony addresses the duration of the leak; presumably its duration would vary with the level of fluid in the barrel, the location of the hole, the amount of pressure inside, the promptness with which the leak is discovered and stopped, and perhaps other factors. Suddenness depends on duration as well as on abruptness of commencement. Liberty Mutual Ins. Co. v. SCA Serv, Inc., 412 Mass. at 336; Lumbermens, 407 Mass. at 681 n.6.

 Roy’s deposition testimony that “there is a reference to TCE possibly being present in the TCA formulation” would also support this view.

 The present record does not indicate whether it is possible or feasible to allocate remediation costs as between the contaminants. That issue could be addressed in proceedings on damages, if Arrow succeeds in establishing coverage for the TCE contamination.